## MILWAUKEE CARVING CO. v. BRUNSWICK-BALKE COLLENDER CO.

(Circuit Court of Appeals, Seventh Circuit. October 6, 1903.)

No. 813.

1. PATENTS—ASSIGNMENT—TITLE TO SUPPORT SUIT FOR INFRINGEMENT.

An instrument granting the exclusive right to manufacture, use, and sell, or lease to be used, a machine for which the grantors have applied for a patent, and containing an agreement to also assign a like right in any other machine or improvement for a similar purpose, for which the grantors may procure a patent, does not constitute a legal assignment of a patent granted on a subsequent application, which will support a suit by the grantee for its infringement.

2. SAME—VALIDITY AND INFRINGEMENT—CARVING MACHINE.

The Smith and Post patent, No. 443,802, for a carving machine, covers a true combination of old elements, which was not anticipated in the prior art, either as to the combination or the results attained, and which possesses patentable novelty and merit. The invention, however, is not one of a pioneer character, but rather of an improvement on the machines of the prior art; and the scope of the patent is therefore limited to the actual combination of essential parts as shown, and cannot be construed to cover other combinations of elements, of different construction and arrangement, although the same elements may be employed and like results attained, unless the changes are merely colorable. So construed and limited, the patent is not infringed by the machine of the Lochman patent, No. 571,535, which is also an improvement on prior machines in the same direction, and by the use of some of the same old elements, but in a combination of different construction and arrangement, and which also contains different elements.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

This appeal is from a decree dismissing the bill of the Milwaukee Carving Company for want of equity. The bill alleges ownership of two letters patent for improvement in carving machines, issued to T. L. Smith and P. W. Post—one, No. 443,802, dated December 30, 1890, and the other, No. 447,796, dated March 10, 1891—and infringement by the defendant, the Brunswick-Balke Collender Company.

The devices described in the patents are machines to produce carving by duplication of a previously prepared model, and the specification of patent No. 443,802 and the drawings, in so far as they are material, are as follows:

"Our invention relates to carving and cutting machines; and it consists of certain mechanism and combination of parts whereby any object of a size within the limits of the machine may be exactly reproduced mechanically from a block of raw material, and without the employment of skilled labor, all as will be fully set forth hereinafter, and pointed out in the claims.

"In the drawings, Figure 1 is a side elevation of our machine. Fig. 2 is a front elevation of the same. Fig. 3 is a plan view of the lower part of the machine below the section line, 3, 3, in Fig. 1. Fig. 4 is a plan view, partly broken away, of the upper part of the machine, showing only the driving and counter-balancing mechanism, and omitting the guiding and cutting mechanism. Figs. 5 to 11, inclusive, are detail views illustrating pivot-joints of the machine. Figs. 12, 13, and 14 are detail views illustrating the guiding and cutting tools and their connections. Figs. 15, 16, and 17 are details showing the construction of the operating-table; and Figs. 18, 19, and 20 are similar views showing a modified construction for special work.

"A, A, represent the vertical timbers of the supporting-frame of our machine, and B, B′, the longitudinal horizontal timbers, while C, C′, D, D′, $D^2$, and E, E, are the main transverse horizontal timbers, in addition to which this supporting-frame is thoroughly braced, as shown, by the crossed pieces, a, a, b, b, and c, c, and others not lettered, as strength and steadiness are essential.

"To the under side of the projecting front ends of the upper longitudinal timbers, B, B, is secured the cross-timber, D′, and to the under side of this timber are fastened brackets, d, d, in the lower arms of which are the screws, d′, having conical bearing-points which fit into corresponding countersinks in the ends of the wall-rod, F, and thereby support the same, as clearly shown in the detail view, Fig. 10. This wall-rod, F, is preferably a hollow brass pipe having its ends closed by brass plugs soldered therein and the described countersinks made in said plugs. Clips, e, e, are rigidly attached to this wall-rod, F (as by saw-cutting through the upper ends of said clips and drawing the two edges together by a clamping-screw, f, or by soldering, or by both), and the lower ends of these clips are bifurcated and carry bearing-screws, e′, e′ (preferably like the screws, d′, just described), which find corresponding countersunk bearings in the opposite sides of a small brass casting, $e^2$, whose lower part is hollow, to receive one end of a rod, G, secured therein in any suitable manner, as by a saw-cut through a boss on the lower end of the casting and clamping-screw, f′, as shown in detail in Fig. 10 and the detail view, Fig. 11 (taken on the line, 11, 11, of Fig. 10), or by soldering, or both. There being two clips, e, there are, of course, two rods, G, which we term 'side rods,' and which are best shown in Fig. 2, and which are jointed to two other side rods, G′, G′, and a double central cross-rod, H, H, the connection being shown in detail in Figs. 7, 8, and 9, as follows: The lower ends of side rods, G, G, are each fitted to castings, g (in similar manner to their union with castings, $e^2$, as by soldering or saw-cut and clamping-screws, $f^2$, or both), and the free ends of these castings, g, each carry a double-pointed pin, h, rigid therein, while the upper ends of the side rods, G′, G′, are each provided with a peculiar casting, g′, the upper ends of which castings are bifurcated and split and provided with interior countersinks, so as to enable these ends to be sprung over the conical points of the double-pointed pins, h, and with exterior countersinks in line with the interior ones to receive the conical points of the screws, i, i, of the

end pieces, I, and I', of the double central cross-rod, H, H, the said upper split portions of said castings, g', being further held together by the clamping-screws, $f^3$, while the lower ends of said castings, which receive the side rods, G', may be saw-cut and clamped by the screws, $f^4$, or soldered to the said side rods, or both, and each pipe, H', of the double central cross-rod, H, H, is similarly united to the adjacent ends of the end pieces, I and I', as indicated at $f^5$.

"In all of the detail views where the conical pointed bearing-screws are shown we have also shown jam-nuts (not lettered), which are necessary to keep the screws from turning.

"The lower ends of the side rods, G', G', are connected, as hereinafter described, to the tool-rod, J, and the parts thus described, consisting of the wall-rod, F, side rods, G, G, central double cross-rod, H, H, side rods, G', G', tool-rod, J, and their jointed connections, constitute a parallel motion, which we term our 'vertical parallel motion,' and we have also a horizontal parallel motion, consisting of the wall-rod, K (which is connected by brackets, k, k, to the face of cross-timber $D^2$), side rods, L, L, double central cross-rod, M, side rods, L', L', and the said tool-rod, J, and the two described parallel motions are precisely alike in construction and arrangement, with the exception of the manner in which the said two motions are connected to the common tool-rod, which will now be described. This connection is best illustrated in the detail views, Figs. 5 and 6. The tool-rod, J, is preferably a pipe, which carries near each end a casting, N, each having upward-extending lugs, j, j, and horizontally-extending lugs, l, l, the former to receive the swivel-piece, O, and the latter to receive the right-angled casting, m, whose free horizontal arm receives one of the side rods, L', of the horizontal parallel motion rigidly secured therein, as by saw-cut and clamping-screw, $f^6$, or solder, or both, as previously described, the said casting, m, having countersinks in each end of its vertical arm, which receive the conical points of the bearing-screws, l', l', passing through the described lugs, l, l. The entire lower part of the main body of the casting, N, is saw-cut to enable it to be firmly clasped to the tool rod, J, by clamping-screws, $f^7$. The swivel-piece, O, is practically U-shaped in transverse section, and in each end of the lower central part is a countersink to receive the conical points of the bearing-screws, j', which pass through the described upward-extending lugs, j, of the casting, N, while at right angles to these screws, j', are other bearing-screws, n, n, which pass through the upper side portions of the swivel-piece, O, the conical points of these screws, n, projecting into countersinks on opposite sides of the lower end of the casting, p, whose upper end receives the lower end of one of the side rods, G', of the vertical parallel motion, which rod is secured therein by saw-cut and clamping screw, $f^8$, or solder, or both, as previously described. The effect of the horizontal parallel motion is to compel the tool-rod, J, to be at all times parallel to the lower wall-rod, K, and the effect of the vertical parallel motion is similarly to compel the said tool-rod, J, to be at all times parallel to the upper wall-rod, F, and consequently the effect of the two combined parallel motions is to compel the said tool-rod, J, to be always parallel to both the wall-rods, K and F, while the effect of the swivel-connection, O, O, between the tool-rod, J, and the vertical parallel motion is to permit the plane of the vertical motion to assume any angle to the plane of the horizontal motion, thereby allowing perfect freedom in the movement of the tool-rod.

"We will next describe the guiding and cutting tools and their connections. From the tool-rod, J, there depend two braced brackets, P, P, whose upper ends are rigidly attached to said rod, while their lower ends carry conical-pointed bearing-screws, q, q, which take into corresponding countersinks in the adjacent ends of a yoke, Q, and thereby support it. This yoke consists of two transverse ovals united by a rigid rod, as shown in Fig. 12, and each oval carries a tool-holder, q', supported therein by means of conical-pointed bearing-screws, r, r, whose points enter countersinks in the ends of said tool-holders. One of these tool-holders carries the shank or hand-piece, R, of the cutting-tool, R', while the other carries the shank or hand-piece, S, of the guiding-tool, S', and the said tool-holders also support upwardly-projecting arms, $R^2$ and $S^2$, bifurcated at their upper ends, and there receiving a cross-

rod, T, supported by means of conical-pointed bearing-screws, s, s, passing through the said upper ends of the arms, $R^2$, $S^2$, and into countersinks in the cross-rod, T, whereby the guiding and cutting tools are free to swing in any desired direction, but compelled to always move exactly alike and parallel to each other.

"The term 'tool-carriage' will be hereinafter employed to designate that part of the apparatus which is carried and controlled in its movements by the parallel motions, and which in turn carries the tool-holders. As represented in the drawings, this tool-holder consists of the connecting-rod, J, by which the two parallel motions are coupled together, and the needful attachments for supporting the tool-holders and tools and permitting their movements; but the form and construction of the carriage may be considerably varied without departing from our invention—as, for instance, so constructing the tool-rod, J, as to make it answer the purpose it serves in our machine, as herein illustrated by drawings, and also carry the tools themselves; but

we much prefer the use of brackets and yoke connected thereto, as we have shown them.

"The driving and counterbalancing mechanism will now be described. Between the rear transverse timbers, C and C′, of the supporting-frame are located two yokes, U and V, which are of generally oblong shape, with upper and lower bosses provided with countersinks to receive the conical-pointed ends of bearing-screws, u, u, and v, v, respectively, which screws pass through the described timbers. The yoke, V, is provided with conical-pointed bearing-screws, v′, v′, passing through the upright sides of said yoke and into countersinks in the end of a cross-bar, t, which forms an integral part of the long, bent balancing-rod, T′, whose projecting rear end carries a weight, t′, and to whose front end is attached one end of a cord, $t^2$, whose other end is attached to the tool-rod, J, at the front of the machine, so that the weight, t′, will serve to counterbalance the weight of the two parallel motions and the tool-rod, J, and attachments. The other yoke, U, has side bosses, which are perforated to receive a shaft, w, and which are themselves

received within bearings in the bifurcated rear-end extension, $w^2$, of another rod, W, which latter is made in two sections in front of the bifurcated portion joined by a sleeve, W′, so as to be adjustable in length, and secured in said adjustment by setscrews, w′, w′. The front portion of this rod is tubular and loosely receives the rear end or shank of a shaft bearing, $W^2$, whose front end receives a flexible shaft, X, whose lower end connects with the cutting-tool, R′, in similar fashion to the flexible shafts of dental engines, while the upper end of said shaft is connected to a pulley, x, from which an endless belt, X′, extends to and around a large pulley, $X^2$, on the shaft, w, which shaft also bears a smaller pulley, x′, from whence leads a belt, $x^2$, to a source of power. (Not shown.) The projecting rear ends of the extensions, $w^2$, of the bifurcated rod, W, are each provided with a weight, $w^3$, to

counterbalance the forward projecting end of the rod, W, and the flexible shaft, X. It is necessary, however, that the driving mechanism be more or less flexible, and a directly-connected single belt, such as has been heretofore commonly used in carving-machines, cannot be employed in our machine, since any movement of the driven cutting-tool toward the driving-pulley would slacken the belt and diminish or check the motion of the tool.

"We adopt the device of the flexible shaft shown and described herein in lieu of a single belt or other power-transmitter which does not permit the free movement of the cutting-tool from back to front and side to side of the work-table without interfering with the motion of the cutting-tool. The necessary speed of rotation imparted to this tool is very great, and, though it depends upon and varies with the material worked and size of tool em-

ployed, we have found that ordinary woods are best treated with tools not larger than a quarter to five-sixteenths of an inch (and in finishing much smaller tools are used), and running at a speed of from ten thousand to fifteen thousand revolutions per minute. To maintain this high speed, it is desirable to have the most effective means of transmission possible, and, in order to make the machine delicate in movement, the traveling parts must be light, as otherwise the momentum of these parts in their movement would interfere with fine work. It will, of course, be understood, also, that any suitably-constructed framework may be employed to support and carry the operative mechanism of our machine, and the words 'timber' and 'timbers,' etc., occurring in the specification, are intended to include any corresponding

or equivalent parts of a frame of metal or other material that may be adopted.

"Y is the operating-table, the preferred form of which is shown in detail in Fig. 15, and which is cut out to receive two circular plates, y, y, flush with the top thereof, and having downwardly-extending hubs, y′, y′, slots, $y^2$, $y^2$, and holes for central removable screw-points, $y^3$. The table is supported on the front projecting portions of the longitudinal horizontal timbers, B′, B′, and bolted to the under sides of said timbers is a transverse timber, $B^2$, to which are attached the boxes, $b^2$, $b^2$, of the vertical spindles, Z, Z, and the lug, b′, carrying a downward-projecting stud, $b^3$, which supports an intermediate gear, Z′, meshing with the gears, $Z^2$, $Z^2$, which are fast upon the vertical spindles, Z, Z, which latter are stepped in a base-plate, z, and to whose upper portions the hubs, y′, of the plates, y, are also secured, while the removable screw-points, $y^3$, are fastened in the tops of these spindles. Thus

any movement of one spindle will produce a corresponding movement in the other, and the two attached plates, y, y, will always move together equally.

"We will next proceed to describe the operation of our machine. As already described, the guiding-tool and cutting-tool are so connected that any movement of one will be faithfully duplicated by the other, the said movement being wholly unrestricted in direction, and limited only in extent. The preferred cutting-tool, R′, is a sphere pierced by a cylindrical hole of diameter smaller than the sphere, tangent to the sphere at one point, and two of the edges of the hole thus formed being made cutting-edges, and the rest of the spherical surface cut away to form a clearance, while the guiding-tool is necessarily of the same outline as the cutting-tool before the hole and cutting-

edges are formed in the latter. For carving objects in high relief—groups of statuary, figures, etc.—we place the model or pattern upon the plate, y, under the guiding-tool, and fasten the screw-point, $y^3$, firmly into the top of the corresponding vertical spindle, Z, and into the base of said model, as clearly indicated at the right in Fig. 15, and, if necessary, additional screws may be inserted from below the plate, through the slots, $y^2$, therein, into the base of said model or pattern, and then upon the other plate, y, below the cutting-tool, the block to be carved is similarly secured (said block being preferably roughly cut into the general outlines of the model, so as to remove wholly the superfluous material), and then the guiding-tool is held by the operator and passed over the model, so as to bring it into contact with every portion of the surface thereof, the cutting-tool making the same motions simultaneously, and as the latter is revolved at the necessary speed (according to the material being carved) by means of the power transmitted through the belt, X′, flexible shaft, X, and attachments, the said tool will cut out the block into the exact configuration of the model. When the surface nearest the operator is entirely carved, he has only to grasp one of the gear-wheels, $Z^2$, and give it a slight movement, to bring a fresh surface of both model and block before him, and thus he can always work to the greatest advantage with the part of the model to be copied and block to be carved directly in front of him. When a panel, bas-relief, or other flat object is to be carved, the model and block are simply fastened in place on the table, Y, and carved as before, except that in such instances the said model and block do not have to be rotated. In case a very long object is to be carved, we find it expedient to remove the screw-points, $y^3$, and employ an auxiliary table (merely a flat board) placed on top of the table, Y, and with the model and block secured to said auxiliary table, so that the design can be copied in sections within the limits of movement of the tool-rod and attachments; and, in order to insure the perfectly-straight movement of the auxiliary table when it is to be moved to bring a fresh section into place, we prefer to employ an ordinary adjustable gauge of any suitable construction, as shown at Y′ in Figs. 2 and 3, to make a straight-edged guide for said auxiliary table. When operating on long pieces whose periphery is to be carved—as, for example, furniture-legs, stair-posts, canes, umbrella-handles, and the like—a modification in the arrangement of the operating-table is necessary, and illustrated in Figs. 18, 19, and 20. This change is practically merely substituting a vertical position of the parts for their former horizontal position, and vice versa; the gear-wheels, $Z^2$, $Z^2$, and intermediate gears, Z′, and plates, y, being vertically arranged, while the spindles, Z, and shaft, $b^3$ (which takes the place of $b^3$), are now horizontal. When the model and piece to be carved are of moderate length, no further support than that offered by the screw-points, $y^3$, and screws through the slots in the plates, y, is necessary; but, if the said model and block are unusually long and heavy, it becomes essential to provide a support for their opposite ends, as indicated in Figs. 18 and 20, and to this purpose (and to further provide for varying lengths of the articles to be carved) the upper surface of the table, $Y^2$ (which takes the place of table, Y, and rests on the longitudinal timbers, B′ B′), is provided with two longitudinal T-slots, $y^4$, $y^4$, which receive tongues $b^4$, depending from the bases of the boxes $b^2$, and similar tongues $b^5$, depending from the bases of the foot-stocks $b^6$, which carry the centers $b^7$, so that the said foot-stocks may be moved within the said slots to any point to or from the plates y necessary on account of the length of the model and block and then fastened at the desired point by tightening the T-bolt $b^8$, as shown best in detail view, Fig. 20, while by reason of the described slots, $y^4$, the centers, $y^3$ and $b^7$, will always be kept in line. For greater convenience in operating the gears, $Z^2$, $Z^2$, to turn the model and block, the shaft, $b^3$, of the intermediate gear, Z′, is extended to beneath the front of the table, $Y^2$, and there supported in suitable bearing, $b^9$, and provided with a hand-wheel, $b^{10}$.

"In order to accommodate the table, $Y^2$, to work which is so long as to require to be done in sections, the said table may be grooved, as at $y^5$, on the under side, so as to rest upon suitable tracks, $B^3$, secured to the upper surfaces of the timbers, B′, and thus the table may be moved back and forth, after the fashion of the auxiliary table hereinbefore described, for accom-

plishing a like purpose with flat work, the described grooves and tracks serving the purpose of the gauge, Y', in section work.

"While we have described our two parallel motions as 'vertical' and 'horizontal,' respectively, this was merely for convenience, and we wish it understood that our said combined two motions may be suspended at any variation to a right angle found convenient in any given instance, or that either motion may be suspended at any desired inclination."

The claims in patent No. 443,802, of which infringement is alleged, are numbered and read as follows:

"(8) In a carving machine, the combination with a suitable supporting-frame, of a tool carriage, a parallel motion connected therewith, and so constructed as to permit the free movement of said tool carriage while the latter is kept constantly parallel to a fixed line, a guiding tool and a cutting tool connected with each other and with the tool carriage by a jointed connection, permitting the simultaneous movement of the same, and permitting the inclination of the cutting tool at a varying angle to the tool carriage, and mechanism for imparting motion to the cutting tool, substantially as and for the purposes set forth.

"(9) In a carving machine, the combination, with a suitable supporting frame, of a tool carriage, a parallel motion connected therewith, and so constructed as to permit the free movement of said tool carriage while the latter is kept constantly parallel with a fixed line, a guiding and cutting tool connected with each other and with the tool carriage by a universally-jointed connection, permitting the simultaneous movement of the same, and the inclination of the cutting tool at any angle to the tool carriage, and the mechanism for imparting motion to the cutting tool, substantially as and for the purposes set forth."

"(12) In a carving machine, the combination, with a suitable frame, of a tool carriage, a parallel motion connected therewith, a guiding tool and a cutting tool pivotally connected with the tool carriage, a connection from one tool to the other, and a flexible power-transmitter connecting the cutting tool with a source of power, said parts being arranged substantially as set forth, whereby the movement of the guiding tool over a pattern is caused to produce like movement of the cutting tool, and said cutting tool is rendered capable of inclination.

"(13) In a carving machine, the combination, with a suitable frame, of a tool carriage, a parallel motion connected therewith, a guiding tool and a cutting tool connected with the tool carriage by a universal-joint connection, and connected with each other so that the movement of the guiding tool over a pattern shall produce similar movements in the cutting tool, and a flexible power-transmitter connecting the cutting tools with a suitable source of power, substantially as and for the purposes set forth."

"(19) In a carving machine, the combination, with a suitable frame, of a tool carriage, a parallel motion connecting the same with said frame, connected guiding and cutting tools having a jointed connection with the tool carriage, permitting their simultaneous movement and the inclination of the cutting tool to said carriage, mechanism for imparting motion to the cutting tool, and a sliding work support or table, substantially as and for the purposes set forth.

"(20) In a carving machine, the combination, with a supporting frame, of a tool carriage, a parallel motion connecting the same with said frame, connected guiding and cutting tools having a universal joint connection with said tool carriage, and a sliding work support or table, substantially as and for the purposes set forth.

"(21) In a carving machine, the combination, with a suitable supporting frame, of a tool carriage, a parallel motion connecting the same with said frame, connected guiding and cutting tools having a jointed connection with the tool carriage, permitting their inclination thereto, a flexible power-transmitter connecting said cutting tool with the source of power, and a sliding work support or table, substantially as and for the purposes set forth.

"(22) In a carving machine, the combination with a supporting frame of a tool carriage, a parallel motion connecting the same with said frame, connected guiding and cutting tools having a universal joint connection with

said carriage, a flexible power-transmitter connecting said cutting tool with a source of power, and a sliding work support, substantially as and for the purposes set forth."

The machine used by the defendant, constituting the alleged infringement, is made in substantial conformity with letters patent No. 571,535, issued to E. Lochman November 17, 1896. The answer denies infringement of the Smith and Post patents, denies invention in either patent, and sets up numerous patents and publications by way of anticipation.

The Lochman device is shown in vertical section (Fig. 1) and side elevation (Fig. 2) as follows:

E. H. Bottum, for appellant.

Lysander Hill and Curtis T. Benedict, for appellee.

Before JENKINS and BAKER, Circuit Judges, and SEAMAN, District Judge.

SEAMAN, District Judge (after stating the facts as above). The appellant's bill alleges ownership and infringement of two letters patent, Nos. 443,802 and 447,796, both issued to Thomas L. Smith and Paul W. Post, as inventors, and the answer raises the issue of title.

Evidence of title rests on an instrument purporting to be made by the patentees, bearing date February 6, 1888, and recorded in the Patent Office February 24, 1888, which is not printed in the transcript of record, but is referred to and expressly offered as testimony on behalf of the appellant, and a copy appears subsequently certified from the court below. No objection is made in respect of title to the first mentioned, No. 443,802, but the appellant's title to letters patent No. 447,796 is challenged. We are of opinion that no sufficient title appears to sustain the bill for infringement of the latter patent. The purported assignment referred to grants "exclusive right to manufacture, use and sell or lease to be used the carving machines for which said Smith and Post have lately applied for letters patent," under application of October 3, 1887, serial number 251,296, which describes only the application on which No. 443,802 issued. The application for No. 447,796 was filed April 9, 1888, and the patent was issued March 10, 1891, both dates being subsequent to this grant; but the assignors "further agree and bind themselves that in case they shall by invention or purchase become the owners of any invention in or improvement upon carving machines," or for analogous purposes, "they will transfer and assign a like exclusive right," and the intention is stated "to confer on the Milwaukee Carving Company the exclusive right" to use any carving machine for which the assignors "have procured or may procure any patent rights whatever." While the terms of this agreement in reference to subsequent "invention in or improvement upon carving machines" are probably applicable to the device shown in patent No. 447,796, and may be enforceable between the parties, as authorized in Littlefield v. Perry, 21 Wall. 205, 226, 22 L. Ed. 577, it is plain that such agreement is executory only, and not an assignment, within the statute, so that no legal title is conferred. The subject-matter was not then in being, was incapable of sale and delivery, and, however binding the contract was upon the inventors to grant the right or title in their subsequent invention, it is not a legal assignment, and, at the utmost, confers upon the appellant a mere equity, with the legal title in the patentees. 2 Robinson on Patents, § 771; Curtis on Patents (4th Ed.) §§ 171, 172; Regan Vapor Engine Co. v. Pacific Gas Engine Co., 49 Fed. 68, 1 C. C. A. 169. Suit by an assignee for infringement is authorized only when the assignment is complete within the statutory requirement. Waterman v. Mackensie, 138 U. S. 252, 256, 11 Sup. Ct. 334, 34 L. Ed. 923, and cases reviewed; Pope Mfg. Co. v. Gormully Mfg. Co., 144 U. S. 248, 251, 12 Sup. Ct. 641, 36 L. Ed. 423. The rights of the patentees cannot be adjudicated in their absence, and the claimant of an equitable title or interest cannot maintain suit for infringement upon such title alone. 3 Robinson on Patents, § 1099, and cases cited; Stimpson v. Rogers, 4 Blatchf. 333, Fed. Cas. No. 13,457.

The bill rests, therefore, upon the primary patent, No. 443,802. This patent embodies the combination under which the appellant makes a useful carving machine for duplicating carvings from a model, and has achieved success in the sale of rights to use the machines. The questions arising are not materially simplified by thus eliminating the subsequent patent, No. 447,796, from the issue of infringement.

The appellee's machine is made in conformity with another and later patent, accomplishes like results by combining old elements, and the main controversy is whether the combination so employed infringes the combination of old elements shown in patent No. 443,802.

While the defense of anticipation is set up against this patent, and some 57 prior patents, domestic and foreign, are introduced in its support, no patent or publication appears showing the same combination of elements or adaptability for like results. The nearest approach to the combination is found in certain foreign patents cited by the expert on behalf of the appellee, namely, Hawkin's English patent, No. 2,735, dated in 1803, on "machinery for writing, painting, drawing, ruling lines," etc.; Robertson's (1837) English patent, No. 7,363, on "machine for sculpturing marble, stone, and other substances"; Conte's (1845) English patent, No. 10,850, for "carving machine"; and La Maire's (1852) French patent, No. 8,266, for "sculpturing stone, marble, wood, and other materials." These patents are of value as examples of the prior art, both in carving machines and for analogous purposes, for interpretation of the claims; but for the present purpose it is sufficient to remark that neither embodies the combination shown in patent No. 443,802, leaving the distinctions to be pointed out when the scope of invention is considered. So in reference to the numerous other patents introduced—from the field of wood carving and the various fields of working in or engraving on wood, metals, stone, and glass—while many machines appear for wood carving, including devices for duplicating carvings, none shows the combination embodied in the present patent, nor identity in the results of the united elements. The elements appear severally in one or another of such prior patents, but are not all united in either. These patents furnish evidence of the prior state of the art, but do not deprive the new combination of patentable novelty. Parks v. Booth, 102 U. S. 96, 103, 26 L. Ed. 54. Nor are the claims in question subject to the objection urged on behalf of the appellee that it is "a mere collocation or aggregation of old elements," as it is plain that the several elements are brought into co-operation and thus "perform additional functions and accomplish additional results," forming a true combination. 1 Robinson on Patents, § 155.

Impressed with the undoubted merit of the Smith and Post invention, the question whether it is infringed by the appellee's machine, made under Lochman's later patent (No. 571,535), has presented difficulty in its solution. The rule is well settled, however, that the grant of a subsequent patent raises a legal presumption of patentable difference from the earlier invention (Miller v. Eagle Manufacturing Co., 151 U. S. 186, 208, 14 Sup. Ct. 310, 38 L. Ed. 121; Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 8, 23, 23 Sup. Ct. 521, 47 L. Ed. 689), and we are convinced as well that substantial difference in the combinations is established as matter of fact.

It is true, as stated by one of the experts, that both machines are "founded on the scheme of tools and tracer carried in a freely moving articulated frame, so that the tools and tracer can be moved freely in every direction, and the tools duplicate the motions of the tracer; and on driving mechanism for imparting motion to the tools; and on

the model and stock carried in a sliding work-holder; and on pivoted vibrating frames and jointed parallelograms as a means for permitting the desired freedom of motion." But these features individually are not novel—as they appear in numerous prior patents—and therefore not patentable, except as employed in a new combination. Both machines duplicate carvings from a model by means of a tracer and cutting tools which are so mounted and connected "that the cutting tools will duplicate every motion of the tracer, however slight or whatever its direction." The appellant's tracer and cutting tools operate vertically, so that the model is placed on the work table under the tracer, and the blanks to be carved are placed under the cutting tools, while the appellee's tracer and tools operate horizontally, and the model and blanks correspondingly occupy a vertical plane—a change which is not merely colorable, but due to a difference in the system of parallel motion, and having distinct advantages in operation. The mechanism of each provides parallel motion, "so that as the tracer is passed over the model, and brought into contact with each point of its surface, the cutting tool will cut away from the blank all surplus material, thus leaving a duplicate of the model." Both accomplish undercutting through free tilting movement of the tools—though differing in the means and degree of such tilting operation—and this feature of undercutting constitutes the distinct advance in the art made by the Smith and Post device over all prior carving machines. The appellant's (Smith and Post) means to this end are (1) two parallel motions of the link or pantograph construction, one controlling the horizontal movement of the tools, while the other controls their perpendicular movement; and (2) the gimbal-joint connection of tools and tool carriage, whereby the cutting tool has free movement independent of the carriage movement. Also, "for imparting motion to the cutting tool," revolving at great speed, a flexible shaft is used, thereby permitting the tool to respond to the movements of the tracer without interference. The appellee's (Lochman) machine, on the other hand, has a parallel motion device of the well-known elbow-joint or door system, and does not have the two distinctive horizontal and vertical motions of the appellant's device, nor its essential element of a gimbal-joint connection; and, instead of the flexible shaft, the appellee uses a belt-and-pulley device to revolve the cutting tool. Thus both machines, generally speaking, present a combination of old elements for like purpose. Both utilize the parallel motion idea of means for duplicating carvings, and both achieve the new carving machine result of undercutting. Upholding the prior patent, however, as disclosing useful invention for this important achievement, establishes therein no monopoly in the result, nor in the use severally to that end of well-known elements which enter into the combination. The patent is granted for the combination, as "the particular means devised by the inventor by which that result is attained," and the patentee is entitled to protection against any use of the same combination of elements, combined in the same way, so that each element performs the same function, or against substantially the same use with deviations which are merely colorable. But each of these well-known elements remains open to the use of the subse-

quent inventor for a different combination for like results. Electric Signal Co. v. Hall Signal Co., 114 U. S. 87, 96, 5 Sup. Ct. 1069, 29 L. Ed. 96.

The question whether the later device of Lochman infringes that of Smith and Post depends for its solution upon the scope of invention in the earlier patent. The distinctions and the general rules applicable thereto are stated in McCormick v. Talcott, 20 How. 402, 405, 15 L. Ed. 930, and uniformly upheld, namely: The original inventor of a machine may treat as infringers all makers of machines "operating on the same principle and performing the same functions by analogous means or equivalent combinations, even though the infringing machine may be an improvement of the original, and patentable as such. But if the invention claimed be itself but an improvement on a known machine by a mere change of form or combination of parts, the patentee cannot treat another as an infringer who has improved the original machine by use of a different form or combination performing the same function. The inventor of the first improvement cannot invoke the doctrine of equivalents to suppress all other improvements which are not mere colorable invasions of the first." So in one of the latest decisions upon the subject (Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 8, 19, 23 Sup. Ct. 521, 47 L. Ed. 689) this limitation of the monopoly is applied to an improvement of conceded value, on the ground that it was not within the definition of a pioneer patent, and it was thereupon held that the "claims must be limited in their scope to the actual combination of essential parts as shown, and cannot be construed to cover other combinations of elements of different construction and arrangement."

The changes made by Lochman in the mechanism were apparently designed by way of improvement in certain directions, and are not without practical advantage in some particulars, so that they must be treated as substantial, and not mere colorable evasions of the patent device. By substituting the door system of parallel motion, in connection with a bar which carries the tools and a device aptly described as a parallel ruler arrangement, both parallelism and free tilting of the tools are attained, thus dispensing with the appellant's gimbal-joint connection for such tilting, and allowing use of the belt-and-pulley device instead of the flexible shaft. The range of undercutting is enlarged, and the vertical structure and belt provision have less liability to interfere with the operator than the other form. The fact of countervailing advantages claimed in the appellant's structure cannot affect this view of the differences as substantial, and that a new combination is produced which does not actionably invade the prior one, unless the prior invention is broad enough to monopolize the field of analogous means or elements.

On reference to the prior art for the measure of the Smith and Post conception, numerous patents in evidence, both foreign and domestic, disclose like parallel motion means for like duplicating purposes. The early foreign patents of Hawkins, Robertson, Conte, and La Maire (mentioned in discussing the defense of anticipation) are sufficient examples for present consideration: (1) in the Hawkins

(English) patent, issued in 1803, the machine is for duplicating writing and drawings. Two parallel motions are shown, and the pens or points are connected and jointed so that they work in unison, inclining in various directions and angles, and readily simulate the motions given by the operator of the appellant's machine through the tracer to the cutting tools, though neither cutting tool, nor mechanism for its use, is shown. A purported model of this device was introduced on behalf of appellee, with the explanation that it was supplied with tool and tracer, instead of pens, and "a movable illustrative adjunct" consisting of "a driving pulley connected with the tool by a typefying flexible shaft." As remarked in Topliff v. Topliff, 145 U. S. 156, 161, 12 Sup. Ct. 825, 36 L. Ed. 658, upon the issue of validity:

"It is not sufficient to constitute an anticipation that the device relied upon might by modification be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted nor actually used for the performance of such functions."

Nevertheless the means thus shown must be considered as entering into the prior art. (2) The Robertson (English) patent of 1837 shows two devices for carving and sculpturing with parallelogram machines giving parallel motions to tracer and cutter—one with the tools "rigidly mounted in the outer end of the parallelogram," and "not capable of angular motion with reference" thereto, but their presentation to the work is "provided for by angularly adjusting the work table"; and the other has the tool and tracer "carried by a subsidiary parallelogram which may itself rock on pivots, 4, 4, so as to take up various angles to the main supporting frame"; or, otherwise stated, the tool-carrying frame is hinged to swing for this purpose like a door, and then locked in position for the work, this frame being a link work, capable of lateral movement, while a fore and aft movement is given by the swing of the whole device or of the tool-carrying frame when unlocked. It does not, however, meet the provisions of the patent in suit for free movement and undercutting, as the tools are rigid. (3) Conte's (English) patent of 1845, and (4) La Maire's (French) patent of 1852, are for sculpturing and carving machines, and are closely allied in their structure, each following the Robertson method of parallelograms, with the tool-carrying frame hinged, but neither provides for complete movement of tracer and tool for undercutting and like requirements.

These old devices plainly point the way for the main scheme and elements of the combinations in suit, to maintain the tracer and tools in parallelism for duplicating carvings. The Hawkins provisions for two parallel motions are closely followed in the Smith and Post device, while that of Lochman adopts another system, resembling the devices of Robertson and Conte, though it adheres to the scheme of Hawkins for the support and guidance of the cutting tools. Surely the adoption of these means from the prior art by one improver in the long line of carving mahines cannot exclude the other improver in the same line from the use of the same or analogous elements in a combination "of different construction and arrangement" (Kokomo Fence Machine Co. v. Ketselman, supra), whereby a new machine is

produced, which may (in the language of appellant's brief) "undercut to a degree not attainable by the concrete embodiment of appellant's device shown in its commercial machines."

Passing to the tool-tilting mechanism of the Smith and Post patent, we are convinced that they added to the structures shown in the English patents and prior art, and brought to their combination an essential element in the jointed connection of the tool with the tool carriage, giving them free movement apart from that of the carriage, whereby they duplicate exactly the movements of the tracer, and are at the same time firmly held to their work, thus carving the blank at any desired angle, either for face work or undercutting, and reproducing varied and delicate designs with accuracy and speed beyond all prior achievements in the art, and that for the new use of this well-known gimbal-joint factor in such combination, which contributed largely to the success of the new machine, the owners of the patent are entitled to protection. We are also satisfied that the gimbal-joint feature is not only an essential element of that combination, but that it is made indispensable therein by the special feature of rigid attachment of the tool-carriage rod, J, to the means of parallel motion—a departure from the device of Hawkins—so that the tools could not otherwise have their universal tilting operation. The appellee's mechanism, however, returns to that of Hawkins in the provision of a rocking tool carriage, namely, an upright rocking-bar connecting the ends of the parallel motion, thus rocking in a horizontal plane, while the tool holders are mounted to rock in a vertical plane, but without the use of a gimbal-joint which is inapplicable to such structure. By this arrangement of the parts the desired tilting of the cutting tools in all directions—the function of the gimbal-joint—is achieved. If the device so adopted could be construed as a mechanical equivalent for the gimbal-joint element in any combination patent, the appellant's patent for an improvement would not authorize such construction to cover this return to the prior art. We are of opinion, therefore, that the appellee's machine is thereby differentiated as another combination which does not invade that of the appellant; and this view is strengthened by the apparent advantages of the appellee's means in wider range of tilting, and in adaptability to the belt-and-pulley device for rotating the cutters—a feature which remains for consideration.

On behalf of the appellant it is contended that the belt-and-pulley device of the appellee is the plain mechanical equivalent of the flexible shaft adopted by the former, and that, in any view, it infringes the particular claims in suit, which describe this element as a "flexible power transmitter," or as "mechanism for imparting motion to the cutting tool." Doubtless either of these general terms in the claims referred to may include the belt-and-pulley in their generic sense, but it does not follow that the patent is entitled to a broad construction in conformity with these broad claims. The patent specifies a flexible shaft, with the explanation:

"We adopt the device of a flexible shaft as shown and described herein in lieu of a single belt or other power transmitter which does not permit the free movement of the cutting tool from back to front and side to side of the

work table without interfering with the motion of the cutting tool. The necessary speed of rotation imparted to the tool is very great."

It further states that "a directly connected single belt such as has been heretofore commonly used in carving machines cannot be used in our machine." The belt-and-pulley device of the Lochman machine is not the one "commonly used" for imparting motion, but is provided with ingenious guiding means, so that no interference arises to or from its operation, and it is perfectly adapted to its purpose in this machine. The experiment made upon the argument to demonstrate that this device was equally adapted to use in the appellant's combination was ingenious, but futile. It is true that the device was made experimentally operative, but for that purpose the appellant's tool holder was reconstructed to provide two combined yokes (horizontal and vertical), and guide pulleys were mounted on the parallel motion devices to carry the belt over them. That it was not adapted to such use without material changes of and additions to the appellant's structure was manifest, nor did it satisfactorily appear that the belt so arranged would serve for practical operation. In other words, the entire mechanism of the appellant's structure is adapted to the use of a flexible shaft as the power transmitter, and, as stated in the patent, "a directly connected single belt * * * cannot be used" therein. Unless the form of flexible shaft known as the "tumbling-shaft" could be utilized for the purpose, no equivalent for the form specified in the patent is called to our attention which appears to be adaptable to such structure. Certainly the belt-and-pulley device of the appellee's patent is not fairly adaptable. The ruling in Hoffheins v. Russell, 107 U. S. 132, 147, 1 Sup. Ct. 570, 27 L. Ed. 332, is in point, and decisive against the equivalency of these elements in the two combinations involved in the present controversy. So considered, the various contentions in the argument over the limitations imposed by the references to a belt-and-pulley transmitter in the specifications of the prior patent do not call for discussion.

Referring to each device as an entirety, the appellant contends that the Smith and Post machine can be turned over on its side, and thus become operative in a horizontal plane, alike with that of Lochman, without changes or addition of parts, so that "its various parts then assume the same location with relation to each other" shown in the Lochman machine. That the mechanism can be operated in this way to a limited extent is true, but it is equally obvious that the structure is designed for vertical operation of the cutters, and, without reconstruction, cannot be made practically operative for horizontal cutters. The function of the parallel motions and other parts would be disturbed, and serious interference with operator and work would be inevitable. The case in this respect is fairly within the doctrine of Wicke v. Ostrum, 103 U. S. 461, 469, 26 L. Ed. 409, and we find no merit in the appellant's contention.

We are constrained, therefore, to the opinion that the appellant's patent, No. 443,802, is not infringed by the machine in controversy, and that its title under patent No. 447,796 does not appear. As the decree of the circuit court dismissing the bill conforms to this view, it is affirmed.