EIBEL PROCESS CO. v. REMINGTON–MARTIN CO.

(District Court, N. D. New York. August 16, 1914.)

PATENTS &⇒328—VALIDITY AND INFRINGEMENT—PAPER-MAKING MACHINE.
  The Eibel patent, No. 845,224, for an improvement in Fourdrinier machines, *held* void for prior public use; also not infringed, if conceded validity.

In Equity. Suit by the Eibel Process Company against the Remington-Martin Company. On final hearing. Decree for defendant.
See, also, 197 Fed. 760.

This is a suit in equity to restrain alleged infringement by defendant of United States letters patent No. 845,224, issued February 26, 1907, on application filed August 22, 1906, and for an accounting.

Fish, Richardson, Herrick & Neave, of Boston, Mass. (Frederick P. Fish, Guy Cunningham and Harrison F. Lyman, all of Boston, Mass., of counsel), for complainant. ·

Hugo & Yost, of Watertown, N. Y. (Franklin H. Hough, of Washington, D. C., of counsel), for defendant.

RAY, District Judge. The alleged invention relates to Fourdrinier machines, and especially that part mentioned in some of the patents found in the art as the wet end of such a machine; that is, that portion extending from the breast roll to the couch roll. The patentee says that the invention—

"has for its object to construct and arrange the machine whereby it may be run at a very much higher speed than heretofore and produce a more uniform sheet of paper, which is strong, even, and well formed."

The patentee also says:

"My invention is embodied, essentially, in the first part or element of the machine having the Fourdrinier wire or paper-making wire, and consists in causing the stock to travel by gravity in the direction of movement of the making wire and approximately as fast as the making wire moves, thereby resulting in a 'gravity feed' for the machine. The stock may be and preferably is caused to travel more rapidly than the normal or usual speed of the making wire for a certain grade of stock, and means are provided for increasing the speed of the machine so as to cause the making wire to move at a higher rate of speed than usual, being substantially equal to the speed of

the rapidly moving stock. To accomplish this result in a simple manner, the breast-roll end of the paper-making wire is maintained at a substantial elevation above the level, thereby providing a continuous downwardly moving paper-making wire, and the declination thus given to the wire is such that the stock is caused to travel by gravity in the direction of the movement of the wire and substantially as fast as the wire moves. The declination of the paper-making wire may be adjustable, or the speed of the wire may be variable, or both the declination and speed of the wire may be adjustable, in order that the velocity produced by gravity in the stock on the declining wire will approximately equal the speed of the wire. By this arrangement the speed of the machine may be increased to such an extent as to bring the speed of the making wire up to the maximum velocity of the rapidly moving stock, and a strong, even, and well-formed sheet produced, which is more uniform than usual."

It is noted that the patentee says the result desired is accomplished by elevating the breast-roll end of this portion of the machine. This elevates necessarily the breast-roll end of the making wire. The patentee proceeds to state that when this is done there is provided a continuous downwardly moving paper-making wire, and that the declination thus given to the wire is such that the stock is caused to travel by gravity in the direction of the movement of the wire and substantially as fast as the wire moves. It is also noted that the patentee says that the declination of the paper-making wire may be adjusted, or the speed of the wire may be variable, or both the declination and speed of the wire may be adjustable, in order that the velocity produced by gravity in the stock on the declining wire will approximately equal the speed of the wire. He also says that the speed of the machine may be increased to such an extent as to bring the speed of the making wire up to the maximum velocity of the rapidly-moving stock. As a result the patentee says that a strong, even, and well-formed sheet of paper is produced, which is more uniform than usual.

The patentee goes on to state, in substance, that the Fourdrinier wire has usually been arranged to move in a horizontal plane; but he adds that he is aware that means have been provided for adjusting the breast-roll end of the wire to different elevations, usually below the level to provide for running with different grades of stock—as, for instance, with quick stock and slow stock. He adds that:

"So far as I am aware the making wire has always had to perform the work of drawing along the stock, and, as the wire moved much faster than the stock, the stock waved or rippled badly near the breast-roll end of the wire, which gradually diminished until an equilibrium was established, and a smooth, even, and glassy surface presented, and not until the waving or rippling ceased did the fibers lay down uniformly and produce a well-formed sheet of paper."

The patentee also asserts that heretofore the machine—

"has been run necessarily at a slow rate of speed to give ample time for the water to escape and for the fibers to lay down, so as to make a uniform sheet, and in case the time was insufficient the breast-roll end of the wire has been lowered still further, until the desired result was accomplished. In accordance with my invention I operate entirely above the level, to cause the stock to travel by gravity at a velocity approximately equal to the speed of the making wire, which I believe to be a new principle of operation."

Right here is the invention, if any; that is, carrying the stock on the making wire, one end of which is elevated above the level, so that

the stock when discharged thereon will travel by gravity and at a speed substantially equal to the speed of the making wire. This is the new principle of operation, if there be any disclosed in this patent.

To understand these statements of the patentee, it is necessary to understand something of the mode and manner in which paper is produced in one of these machines from the pulp or stock when ready to be made into sheets of paper. Before going into this matter it is well to quote the claims of the patent in issue. These are claims 1, 2, 3, 7, 8, and 12, and read as follows:

"1. A Fourdrinier machine having the breast-roll end of the paper-making wire maintained at a substantial elevation above the level, whereby the stock is caused to travel by gravity, rapidly, in the direction of movement of the wire, and at a speed approximately equal to the speed of the wire, substantially as described.

"2. A Fourdrinier machine having the breast-roll end of the paper-making wire maintained at a high elevation, whereby the stock is caused to travel by gravity faster than the normal speed of the wire for a certain grade of stock, and having means for increasing the speed of the machine to cause the wire to travel at substantially the same rate of speed as the rapidly-moving stock, substantially as described.

"3. A Fourdrinier machine having the paper-making wire declined from the breast-roll to the guide-roll, the breast-roll end of the wire being maintained at a substantial elevation above the level, whereby the stock is caused to travel by gravity, rapidly, in the direction of movement of the wire and at a speed approximately equal to the speed of the wire, substantially as described. * * *

"7. A Fourdrinier machine having the paper-making wire declined from the breast-roll to the guide-roll, and the suction-boxes supported at a corresponding declination, substantially as described.

"8. A Fourdrinier machine having the paper-making wire declined from the breast-roll to the guide-roll, and the several suction-boxes arranged at different elevations, substantially as described. * * *

"12. In a Fourdrinier machine, a downwardly-moving paper-making wire, the declination and speed of which are so regulated that the velocity of the stock down the declining wire, caused by gravity, is so related to the velocity of the wire in the same direction, that waves and ripples on the stock are substantially avoided and the fibers deposited with substantial uniformity on the wire, substantially as described."

The stock referred to is composed of water and the fibers of wood or other material mixed, of course, with other materials, and which, when thoroughly prepared and ready to be made into paper, is discharged upon an endless wire or wire screen with fine meshes, and which is called the "paper-making wire." The pulp, properly prepared and ready to be made into paper, is discharged upon this wire at the breast-roll end, and as this paper-making wire by suitable machinery and power is kept in motion if the paper-making wire is maintained in a horizontal position or on a level, the stock is carried along with it toward the couch-roll end of this part of the machine. This making wire being of the character mentioned, the moisture or water contained in the stock is, of course, constantly dripping through, and the fibers contained in the stock have a tendency constantly to settle onto the wire itself. It is self-evident that, if the stock is discharged upon the breast-roll end of the making wire and projected forwardly toward the couch roll end, it will flow along under the impulse given it, whatever it may be, for a short distance, even if the

making wire is not moved at all. If the making wire is moving, the stock discharged thereon will be carried along with the making wire as matter of course, except that part of the moisture which drips through the wire. It is within the knowledge, I think, of every one who has seen water run in a creek or over a waste weir, that if it meets an obstruction, such as a stone, or a piece of gravel or metal, or is flowing over a depression, there will be more or less ripple, wave, and eddying current. It is also common knowledge that, if water be poured from one dish into another, there will be considerable boiling and eddying of the water. In the case of water running in a creek and meeting obstructions, such as stone and gravel, we have all noticed that the sand or soil carried in the moving water for a distance will gradually settle, but that it will not settle to the bottom of the creek evenly; that is, it will form bars of various forms and descriptions. This is enough to show that with the making wire set horizontally, so as to move on a level, the stock discharged thereon would boil and ripple and eddy at that end of the making wire more or less, depending on the force with which the stock strikes the wire. If the making wire is moved forward and the onpour of stock continues, there will be a time, of course, when the stock settles down or ceases to eddy and disturb the fibers which have a tendency all the time to settle down on the making wire and form a coat which, as it is carried along and the moisture is removed, becomes the paper. To make good paper it is, of course, essential that the fibers lay down on the making wire uniformly, or with substantial uniformity. If the settling or "laying-down process" is interfered with by ripples and currents, or waves, it will show in the paper when formed, and some of it will be thinner than other portions, and some parts weak and others parts perhaps over-strong.

It is self-evident that if the stock is discharged onto the making wire, one end of which is elevated so as to present a sloping surface for it to flow upon, that the stock will run down along the surface of the making wire. The speed of this current of flowing stock will depend, of course, upon the amount of incline given the making wire and the force behind the stock as it is discharged onto such making wire. If the movement of the stock as it strikes the making wire is more rapid than that of the making wire, currents and waves would be produced as the stock would strike the slowly moving making wire, meet the obstruction, and eddies and currents would result to a degree, even if the main part of the stock under the impulse given it moved on more rapidly than the wire. The same result to a degree would follow if the wire should be moving much more rapidly than the stock. If the stock as it is discharged upon the making wire is moving at the same rate of speed as the wire itself, then the two move on together, and there would be, of course, much less of the ripple, etc.

If the paper-making wire should be elevated at an angle of, say, 45 degrees, I do not think much paper would be made, as I do not see how the fibers contained in the pulp would be allowed to settle. The patent concedes that one elevation is required for quick stock and

another elevation for slow stock, and also concedes that in making paper the breast-roll end in use has been elevated above the horizontal line, and also depressed, prior to the application for the patent in suit, and that means for such elevation and depression had been provided and used. An examination of prior patents plainly and conclusively shows that there was nothing new in elevating the breast end of the paper-making wire, or in means for accomplishing this, and that much time and effort had been expended in this direction and in providing means for the purpose mentioned.

So far as I have been able to discover, no one claims to have discovered the advantages of having the wire carrying the stock and the stock move together at substantially the same speed, the stock impelled by gravity and directed by the wire, and to have embodied such idea and principle of operation in a patent, or an application for a patent, prior to the application by Eibel. This idea, so far as letters patent are concerned, appears to have been evolved by Eibel.

It was urged at final hearing that no invention is disclosed, as we have disclosed an old and well-known method of elevating one end of the paper-making wire so it would not impede the flow of the stock as it came onto the wire and thereby cause waves, ripples, and eddying currents at the breast-roll end, and at the same time allow a free and unobstructed gravity flow of the stock for a certain distance, and that it was not invention to ascertain and fix the degree of incline and ascertain by experiment the best method of paper-making by means of a moving wire so adjusted. The rule is invoked that it is not invention to improve in degree merely on a principle of operation old in the art. This may be conceded; but I think Eibel discovered and practically disclosed much more than this. He not only elevated the breast-roll end of the paper-making wire, but regulated the speed at which the wire should move, making it move at equal speed with the stock, so that there is no obstruction to the natural flow of the stock under the influence of gravity, and consequently no eddies and ripples and uneven laying down of the fibers. There is nothing new or patentable in his means for raising and lowering the breast end of this part of the machine.

In his specifications Eibel says:

"I find in practice that by providing a gravity-feed operating substantially as herein described the stock runs smoothly and evenly, without waving or rippling, and the fibers are thereby permitted to settle with great uniformity as regards their distribution over the wire, so that the paper, in addition to being well formed, is very uniform. Furthermore, as the stock is moving with the paper-making wire, instead of being moved by the wire, or essentially by the wire, the formation of the paper will begin at the start and will continue to the end of the travel of the stock with the wire. Furthermore, by making the sheet of paper uniform over all less sulfite or strengthening material is required. Furthermore, as the stock carries less water when arriving at the suction boxes the amount of suction ordinarily required may be reduced, thereby reducing the friction due to the making wire passing over the suction boxes, and hence increasing the life of the wire."

Claims 7 and 8 add to the declining wire the idea of having suction-boxes also correspond in declination or arranged at different elevations to correspond in declination and elevations with the paper-making wire.

This goes merely to an adaptation of such suction boxes to different heights and involves no invention. Suction boxes were old in the art. So means for increasing the speed of the machine, to cause the wire to travel at substantially the same rate of speed as the rapidly moving stock, were common in this and in analogous arts, and involves no invention.

This patent does not specify or indicate any degree of declension for the paper-making wire, or any rate of speed for either stock or wire. Hence nothing is to be done that was not done before, except to regulate the speed of the wire to correspond with the speed of the stock. As the fibers in the stock settle to and lay down on the wire, there will be more or less obstruction to the flow of the stock, and as the water is dripping out through the wire the stock becomes thicker and there is a constant tendency to equilibrium. I am unable to see that the stock moved downwardly on the inclined wire by the action of gravity at the same rate of speed the wire is moving will be at all accelerated by the wire, except that where in contact the constant settling or laying down of the fibers will operate to check the flow at the bottom or next the wire, and hence the movement of the wire will, if equal in speed to the upper part of the stock, overcome the frictional action of the laid-down fibers and keep all parts of the stock, from top to bottom of the flowing stock, moving at the same rate of speed, and hence obviate ripple and currents. In this sense, at a distance from the beginning of the breast-roll end of the wire, it may be and probably is true that the portion of the stock next the wire is aided in being carried along by the moving wire while the upper portion is moved by gravity alone. This accentuates the necessity of having stock which is moving downwardly on a wire screen by gravity (gravity flow) and supported and directed by such wire move at the same rate of speed as the wire itself. This patent emphasizes the fact that the declination of the wire allows gravity to act on the stock, and that the "stock is caused to travel by gravity in the direction of the movement of the wire"; that is, the wire directs the flow. The words "and the declination thus given to the wire is such that the stock *is caused* to travel by gravity *in the direction* of the movement of the wire *and substantially as fast as the wire moves*," should not be construed as 'a statement that the declination of the wire *causes* the stock moving by the force of gravity to flow with the same rapidity the wire moves. The wire controls the direction of the flow of the stock; gravity fixes the speed of the flow of the main portion of the stock; but gravity does not control the direction of the flow, except downwardly, and this direction is, of course, limited and changed by the paper-making wire.

It is alleged as a defense that others, prior to the date of the alleged invention of Eibel, and more than two years prior to his application for a patent, had discovered and quite extensively used the same principle of operation in paper-making machines and for making paper, and had provided means for adapting this principle to the making of paper. This is established to my satisfaction by credible evidence. It cannot be doubted that prior to Eibel, and more than two years prior to his filing date or alleged date of invention, others had made and used machines for paper-making with the breast-roll end of the paper-

making wire adjustable, so as to be elevated and depressed, and this was practiced. The gravity flow of stock on an inclined wire was well known, of course; for any fluid short of a solid, coagulated, or frozen mass will flow with more or less rapidity down hill—that is, down an incline—and the elevation of one end of the wire had actually demonstrated this in this art as to stock. These prior machines had been used, and it seems plain from the credible testimony that it had been discovered by the users that there must be substantial equality of speed between the movement of the inclined wire and the gravity flow of the stock. The witnesses so testify. It seems to me clear from the evidence that the elevation of the wire had been from two inches to six inches. I do not doubt that in some instances there had been a failure to properly adjust the speed of the wire to the speed of the gravity flow of the stock; but this is immaterial, so long as the principle was known, and, with appropriate means to accomplish the end, had been actually and successfully used and practiced by others than Eibel. It is not a case of abandoned unsuccessful experiments, but of actual and continued public use by others at more than one place. In fact, the testimony as to prior use and practice of all this defendant does establishes this clearly and satisfactorily, or, as sometimes stated, beyond a reasonable doubt.

One question involved here is, also: Does this defendant infringe, conceding validity to the Eibel patent? It does not infringe for the reason merely it elevates this breast-roll end of the paper-making wire and provides means for doing it. This was old in the art. It does not infringe for the reason it may use and practice a greater degree of elevation than was formerly used. That would be a mere matter of degree in elevation. Eibel does not define any particular elevation. The evidence shown that prior to Eibel some used one degree of elevation and some another. Eibel has a "substantial" elevation; so did others before him. He also calls for a "high elevation," but does not define it. Defendant does not infringe in providing means to accelerate the movement of the wire—speed it up. It is moved by a steam engine, or motor, having power, as it always has had, to run rapidly or slowly. Defendant does not infringe in elevating or inclining some of the suction boxes, so as to correspond with the elevation or incline of the wire. This had been done before. And in the combination of all these elements, greater elevation of the breast-roll end of the wire, gravity flow of the inpouring stock directed by the wire, as matter of course, regulation of the speed of the paper-making wire to correspond substantially with the movement of the stock, and regulation of the suction boxes, we have something done before, more than two years before, Eibel applied for a patent, as the testimony clearly shows.

In short, I find from the testimony, which is not impeached, or discredited, or really contradicted, that everything this defendant is doing was done, and well-known and understood with many paper makers, before Eibel's alleged date of invention. Going back to August 21, 1904, two years before Eibel filed his application for a patent (August 22, 1906), we find that before that this elevation, declination of

the paper-making wire, had been adopted, means for adjusting it adopted and used, the suction boxes arranged accordingly, the speed of the wire increased so as to keep pace with the rapidly moving stock, and that to this end changes had been made to cause a more rapid and easy discharge of the stock upon the wire, all for the purpose of making paper more rapidly and avoiding currents and eddies. It was found that if the wire moved more rapidly than the stock, or the stock more rapidly than the wire, ripples and eddies were created, and that the paper was inferior, when rapidity by means of gravity flow was attempted, and hence more than two witnesses say the movement of the two was made equal to avoid such a result. And, indeed, there is nothing strange, or remarkable, or improbable in the testimony, for, as we all know, a fluid running as water in a creek, or over the flushboards of a dam, will ripple and eddy more or less, and more if there happens to be a nail, or a gravel stone, or any obstruction on such boards. Running on the stationary, but somewhat shifting, bottom, every pebble and unevenness causes a ripple or an eddy, and if both liquid and obstruction move, but the one moves more rapidly than the other, as already pointed out, there is more or less obstruction to even flow and even settling of the contained matter. There is friction, a constant laying down of the fibers, etc., in one of these machines, and unless an equality of speed in the two bodies is maintained there will be ripples and eddies. It is not at all strange that this fact was observed or discovered by various persons engaged in the paper-making business and running the liquid stock upon and along this paper-making wire long prior to Eibel. Indeed, it would be strange had it not been discovered long prior to 1904 or 1902.

I have not deemed it necessary to discuss the indefiniteness and uncertainty of the claim in using the words "substantial elevation" and the words "whereby the stock is caused to travel by gravity *rapidly*." What does "substantial" mean, and what rate of speed is "rapidly"? May we say that the two, four, and six inches elevation of the prior art was not a "substantial elevation," or a "high elevation"? May we say that with such an elevation of the breast-roll end of the wire the stock discharged thereon would not move "rapidly in the direction of the movement of the wire"? And what is a "high elevation" in such a machine? How is it to be determined, in view of the conceded prior art, the conceded prior uses and elevation of the wire, when and where infringement begins? It seems to me that the claims and specifications of a patent for an *improvement* in a Fourdrinier machine should be sufficiently definite, certain, and specific to enable both the maker and user of such a machine, reasonably skilled in and acquainted with the art, to determine with reasonable certainty when he departs from the prior art and trenches on the "high elevation" or the "substantial elevation" of the patent, and when his stock and wire are moving "rapidly" within the meaning of the patent for the improvement on the prior art. This is especially true when elevating the paper-making wire in the prior art is conceded in the patent.

The patent contains this illuminating declaration on this subject:

"The elevation above the level at which the breast-roll end of the making wire is maintained *will vary* according to the grade of stock; but in any

event it will be *substantial*, so as to cause the stock to *move rapidly* by gravity."

I suppose this stock would move rapidly by gravity when discharged from the slice, should we take the paper-making wire away entirely. It is evident that, the greater the declination of the wire, the more rapidly the stock will move, and, in my judgment, the stock as a whole, being a fluid body, will travel by gravity in the same direction as the moving wire upon which it is discharged; but when it travels "rapidly," and when "slowly," and when at a moderate rate of speed, within the meaning of the patent, is left wholly indefinite and uncertain. Clearly Eibel, by taking out a patent for the particular structure he describes and operating as described, even if it be valid, has not made an infringer of this defendant, who does not use such structure, but confines itself to the principles of operation, uses, and practices and means of the prior art, even if there be some improvement thereon, but not the changes and improvements of Eibel. McCormick v. Talcott, 20 How. 402, 15 L. Ed. 930. This is not a case of "Chinese copy," or of appropriation of the work and ideas of another. Without quotation therefrom, I call attention to the opinion of Mr. Justice Warrington in European Eibel Co., Ltd., v. Edward Lloyd, Ltd., The Illustrated Official Journal (Patents) Supplement, June 21, 1911, in which that learned justice arrives at the same conclusion.

There will be a decree dismissing the bill for want of equity, with costs.