## RANDALL CONTROL & HYDROMETRIC CORPORATION v. ELEVATOR SUPPLIES CO., Inc. *·

(Circuit Court of Appeals, Ninth Circuit. November 22, 1926.)

No. 4947.

Patents ⬡⟶328—1,160,315, claims 14, 15, 20–22, for elevator signaling apparatus, held not infringed.

Newell patent, No. 1,160,315, claims 14, 15, 20–22, for elevator signaling apparatus, *held* not infringed.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Paul J. McCormick, Judge.

Suit by the Elevator Supplies Company, Inc., against the Randall Control & Hydrometric Corporation. From an order enjoining it from infringing the claims of patent in suit, defendant appeals. Reversed and remanded, with directions.

G. E. Harpham, of Los Angeles, Cal., for appellant.

H. Dorsey Spencer, of New York City, and Frank L. A. Graham, of Los Angeles, Cal., for appellee.

Before HUNT and RUDKIN, Circuit Judges, and NETERER, District Judge.

*Rehearing denied January 31, 1927.

HUNT, Circuit Judge. The Randall Control & Hydrometric Corporation appeals from an order enjoining it from infringing on claims 14, 15, 20, 21, and 22 of letters patent No. 1,160,315, issued to Emerson R. Newell in November, 1915. The Elevator Supplies Company, appellee, owns the patent, the validity of which is not involved.

Newell's invention relates to an elevator signaling apparatus, in which a signal or signaling means is provided, adapted to give a signal either to the operator of the car or an intending passenger, and "to restore the same and the circuits which operate such signaling means to normal condition, and which shall·be controlled (preferably at the several floors) by the operator of the car, preferably through operation of the gate mechanism," the object being to provide a construction which shall be simpler and less expensive to install than mechanisms heretofore used.

The claims involved are as follows:

"14. In an elevator signaling apparatus in combination, a car, electrically operated signaling means, means for operating the same comprising a passenger's button at each floor and mechanism corresponding to each button and set thereby, restoring mechanism, comprising a selecting device moved correspondingly with the car, whereby the restoring mechanism is adapted to restore all said passenger's button set mechanisms in succession and correspondingly with the movement of the car, said restoring mechanism being normally incapable of accomplishing the restoration, and means operable by the operator in the car, and adapted, when operated, to put said restoring mechanism in condition such that the selecting device will accomplish the restoration."

Claim 15, after including all of claim 14 down to and including "said restoring mechanism being normally incapable of accomplishing the restoration," includes "a switch normally held open, but closable by the operator in the car, and adapted, when closed, to put said restoring mechanism in condition such that the selecting device will accomplish the restoration."

Claim 20 is as follows:

"In an elevator signaling apparatus in combination, a pair of cars, electrically operated signaling means carried by each car, means for operating the same comprising a passenger's button at each floor and mechanism corresponding to each button and set thereby, restoring mechanism, comprising a selecting device for each car, moved correspondingly with that car, whereby each selecting device is adapted to restore all said

passenger's button set mechanisms in succession and correspondingly with the movement of its car, said restoring mechanism being normally incapable of accomplishing restoration, means for each car operable by the operator of that car, and adapted, when operated, to put the restoring mechanism in condition, such that the selecting device of the corresponding car will accomplish the restoration, said restoring mechanism also comprising means corresponding to each floor and co-operating with said selecting device, whereby the operator in the car can restore only those push button set mechanisms corresponding to the floor where the car then is."

Claim 21 is identical with claim 14, except that the means are described as "controllable" by the operator, instead of as "operable."

Claim 22 is in the language of claim 14 down to the restoring mechanism "being normally incapable of accomplishing restoration," after which follows: "And switch mechanism outside of and not carried by the car and controllable by the operator in the car, and adapted, when operated, to put said restoring mechanism in condition such that the selecting device will accomplish the restoration."

In elevator signaling it became desirable to provide for sending a signal to each of a plurality of elevators, and for so canceling the signals that, if the operator of one elevator did not wish to stop to answer the signal, the signal could still be left for another of the operators to respond. In the advance of the art, types of automatic cancellation of signals were invented, but they contemplated the cancellation of the signal by one of the cars passing a floor from which the signal was sent without considering whether the car stopped to answer the signal. In practical use of such a signal, if the car passed the floor from which the signal was given without answering the signal, not only was the signal in the operator's own car canceled, but it was canceled in all the other cars. The result was that an intending passenger would have to push the button again to give a signal. To meet such difficulties the Smalley and Reiners device, No. 826,752 (1899), and other inventions, were patented.

Newell's contention is that his patent covers the broad idea of providing a break in a commutator controlled signal-restoring circuit, which will prevent automatic cancellation of the signals by the car merely coming to the floor from which the signal was sent until the operator has done something to answer the signal. His signal-restoring circuit is so arranged that the signal is only canceled when the operator has done two things necessary to answer the signal: (1) He must bring the elevator to the floor from which the signal has been sent; and (2) while the car is at that floor, he must open the hatchway gate, or close the hatchway gate, or he must operate the controller handle, either to stop or start the car.

The subject of electrical devices is generally difficult, and we regret that we have not the aid of an independent scientific judgment. But, as we understand Newell's patent, it discloses a signal circuit which is closed, except at the commutator, on pushing the signal button at the floor from which the signal is to be sent. To close the signal circuit a mercury pot arm is dropped into a mercury pot, the arm remaining in the pot until it is lifted by energizing a magnet in a second circuit, called the signal-restoring circuit. Until the signal-restoring circuit is energized, the signal circuit is in a condition where it may be used to complete a signal to any car, the commutator of which is moved to close the commutator break in the signal circuit. The restoring magnets function by lifting the mercury pot arm out of the pot of the signal circuit, so canceling the signal. By so doing the mechanism is restored, so that, when the push button is again pushed, the signal circuit will be set to give the signal at the proper time.

The call signal and commutator means of Newell appear to be the same as in the Smalley and Reiners patent, 826,752. Newell ran two wires from the commutator down the length of the elevator shaft, one wire on each side of the shaft. These wires were connected at each floor by a cross-wire having a break at each floor, the break being over the elevator hatch door. He put a switch at each break. To restore the call signal, its circuit must be unlocked. This unlocking is by a magnet which has a circuit with two breaks in it, one at the commutator and the other at the hatch door. Smalley and Reiners showed such breaks. The break at the hatch door is closed momentarily by a stop carried by the door, and the car may pass a floor at which a call signal has been given without stopping and without affecting the signal lamps. Such a result seems to have been accomplished before Newell by McLean, in patent 748,408, although, in arriving at the result, McLean ran a wire from each floor up to the commutator at the top of the shaft.

There was little expert evidence as to McLean's invention. Study of it, however, shows a switch device at the top of the ele-

vator hatch that was thrown over from one side to the other, as the car might be ascending or descending. All breaks were closed by this switch in the restoration circuits at the top. He had a call signal lock and a release magnet at each floor, each magnet having a circuit with a break that extended up to the switch device or commutator at the top of the shaft. By this arrangement, when a call signal was made at any floor by pushing a button, a light was shown at that floor, and also in the elevator cars. If the operator did not stop at that floor, or if he did not open the door at that floor, the call signals were not affected, and another operator coming in the same direction was notified that a passenger wished to go in that direction. The first elevator that stopped at the floor from which the signal was given (if the operator opened the gate) caused the restoration of the call signals of that floor to their normal position.

Newell changed the position of the unlocking magnet from the side of the door to the top of the shaft; but when the shaft door was opened, whether in the device of Newell or of McLean, the circuit of the unlocking magnet was closed, the call circuit was unlocked, and the signals were restored. Newell used very much less wire by the location of the parts employed, but in restoring call signals the segmental commutator of Smalley and Reiners seems to have operated as did the switch in McLean's device.

When the Randall Corporation made its device, the Smalley and Reiners and McLean patents were open to the public. Appellant had a device, consisting of a tape which runs over a pulley in the top of the elevator shaft having a weight on each end of the tape, one weight being heavier than the other. The heavier weight operated a master switch, which controlled the power operating the elevator car. When the car was moving, the heavier weight held the master switch closed with the power on; but, when the car was to be stopped at any floor, the operator, by suitable means, such as opening the door, lifted the side of the tape carrying the heavier weight, supporting the weight in its lifted position. The lighter weight then caused the other end of the tape to descend. This side of the tape carried the master switch which controlled the elevator power. As it descended, it opened the elevator power circuit, and the car stopped at that floor and the door opened. The hatchway door carried a bar, which, as the door began to open, held the tape that carried the heavier weight. When the door was closed, this bar was

15 F.(2d)—49

withdrawn, the heavier weight descended, the switch side of the tape ascended, the master switch closed the power circuit, and the car was again moved. The master switch frame carried contacts which, as the frame went up, closed the break in the restoration circuit. Newell showed no elevator power control in his patent.

Appellant took the Smalley and Reiners selective commutator, together with their call-signal mechanisms. It used a signal-restoration circuit for unlocking the call signals, making a break in this circuit, with ends of the wires attached to the frame that carried the master switch. It put contact fingers that were operated by the master switch frame, which momentarily closed the break at this point as the master switch frame was moved up after the door was closed. This circuit had a break at the commutator, which was successively closed as the car moved up or down the shaft. The break at the master switch was not closed unless the car power was shut off. This power control switch was located about the center of the shaft, and experts testified that the restoration circuit only runs from the center of the shaft to the commutator in the top of the shaft. In McLean's patent, when the door was opened, the circuit of the unlocking magnet was closed, and the call circuit lock was unlocked, and call signals were restored. In appellant's combination, the weight at the end of the cable brings the reset switch up to an engagement with the contacts, so as to close the second break in the restoration circuit; whereas Newell requires the positive movement of the door, with a part of the door to engage the switch and push it into engagement with the contact, in order to close the restoration circuit.

We do not agree with the argument that Newell's invention clearly comprehends any means controlled directly or indirectly by the operator for closing the second break in the signal-restoring circuit, and that he merely showed the door means as an illustrative preferred construction. His restoration means are confined by his specifications. Of course, there is manual operation in stopping and starting the car in appellant's construction; but the single switch of the restoration circuit is operated by the master switch, which controls the car movement.

Nor do we think that the single master switch used by the appellant should be held to be merely the equivalent of Newell's stops on his hatch gate. The results produced by Newell and by appellant are the same, but the mechanism and operation are substantially

different, and, in the light of the state of the art when Newell's invention was patented, we think that the rules applicable to strict construction must guide us. Miller v. Eagle Mfg. Co., 151 U. S. 208, 14 S. Ct. 310, 38 L. Ed. 121; McCormick v. Talcott, 20 How. 402, 15 L. Ed. 930; Elevator Supplies Co. v. Boedtcher (C. C. A.) 11 F.(2d) 615; Goodyear, etc., Co. v. Davis, 102 U. S. 222, 26 L. Ed. 149.

Counsel for the appellee have referred to the history of Newell's application in the Patent Office, where there were certain declarations of interference—one, the Andren patent, No. 1,109,950; another, the application of McIntosh and Beaubien, No. 1,195,600; another, the application of Reiners, patent No. 1,219,775; and another, the application of McIntyre, No. 1,121,649.

In deciding upon the interferences, the Patent Office considered the sole question of priority of invention as between the claimants. In Westinghouse v. Hien, 159 F. 936, 87 C. C. A. 142, 24 L. R. A. (N. S.) 948, the Circuit Court of Appeals of the Seventh Circuit said: "Patentability being affirmed, it may occur that the application discloses the same invention as another application on file or as a patent already issued. If so, 'an interference' exists, and the patent officers are then required, according to the practice and rules of the office, to set on foot an interference proceeding, in order to determine which of the hostile claimants first discovered the invention. This proceeding is carried on before the Examiner of Interferences, and is a proceeding inter partes, and results either in a decision awarding priority to one, and denying it to the other, or for some particular reason denying priority to either."

The order appealed from is reversed, and the cause is remanded, with directions to dissolve the injunction and to dismiss the bill of complaint.

Reversed and remanded.