### ADT v. BAY STATE OPTICAL CO.

(Circuit Court of Appeals, First Circuit. August 23, 1915.)

#### No. 1123.

1. PATENTS ⚓328—INVENTION—EYEGLASS MOUNTINGS.

The Adt patents, reissue No. 13,466, and Nos. 1,019,214, 1,019,116, 1, 019,117, and 1,040,096, all for eyeglass mountings, held void for lack of patentable invention, novelty, or utility, in view of the prior art.

2. PATENTS ⚓35—INVENTION—EVIDENCE—LACK OF COMMERCIAL SUCCESS.

That a patented article has achieved no success in the field of the practical art is entitled to weight on the question of patentable invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 39; Dec. Dig. ⚓35.

Utility, extent of use, and commercial success as evidence of invention, see note to Doig v. Morgan Mach. Co., 59 C. C. A. 620.]

Appeal from the District Court of the United States for the District of Massachusetts; Frederic Dodge, Judge.

Suit in equity by Leo F. Adt against the Bay State Optical Company. Decree for defendant, and complainant appeals. Affirmed.

Frederick F. Church, of Rochester, N. Y., and Melville Church, of Washington, D. C. (Church & Rich, of Rochester, N. Y., and Marcus B. May, of Boston, Mass., on the brief), for appellant.

Frederic P. Warfield, of New York City (Charles H. Duell and Holland S. Duell, both of New York City, and George P. Dike, of Boston, Mass., on the brief), for appellee.

Before PUTNAM and BINGHAM, Circuit Judges, and HALE, District Judge.

HALE, District Judge. This case is before us, on appeal by complainant from a decree of the District Court for the District of Massa-

chusetts, dismissing the bill. The suit is for the alleged infringement of certain claims in five letters patent of the United States, to wit:

1. No. 13,466, application filed July 16, 1912, reissued September 17, 1912.

2. No. 1,019,214, application filed November 6, 1909, issued March 5, 1912.

3. No. 1,019,116, application filed September 18, 1907, issued March 5, 1912.

4. No. 1,019,117, application filed November 3, 1909, issued March 5, 1912.

5. No. 1,040,096, application filed November 27, 1908, issued October 1, 1912.

All the above patents were issued to the complainant, the patentee. They relate to the art of eyeglass mounting, and to finger-piece eyeglasses. The defendant alleges the above patents to be void, by reason of anticipation, and lack of patentability. It also denies infringement. It manufactures certain finger-piece eyeglasses under United States patent No. 995,661, issued to S. J. Clulee, June 20, 1911.

[1] 1. With respect to the purpose of the invention in the reissued patent No. 13,466, the patentee says:

"My present invention relates to eyeglass mountings, and particularly to that class in which the lenses are connected by a relatively rigid bridge, and the guards or nose-bearing pads are pivoted and actuated toward each other by springs and provided with operating arms or members arranged forward of the lenses by means of which the bearing-pads may be separated for the application of the glasses to, or their removal from, the nose of the wearer.

"The invention consists in certain improvements whereby the guards are mounted upon fixed pivots, and the springs for operating them, while long enough to enable them to be operated easily, are of such nature and so disposed as not to render the mounting unsightly, and further, in certain features of construction and combinations of parts, all as will be hereinafter more fully explained, the novel features being pointed out in the claims at the end of the specification. * * * The feature of providing a winding coil spring for turning the guard on its pivot is advantageous, in that a relatively long spring giving an easy and practically uniform movement is provided, and, furthermore, by locating the spring underneath the support and substantially in line with the pivot of the guard, its diameter may be increased within reasonable limits without interference with other parts of the mounting, or detracting from the appearance of the device as a whole.

"It will be obvious that the shape of the guard as a whole, or of the bearing-pads, may be varied, without departing from my invention, and I do not, therefore, desire to be confined to precisely the construction shown. The provision, in the pivoting movement of the guard on the one hand and its supporting structure on the other, of a relatively stationary element on one of the parts on each side of which a bearing is supplied by the other, such, for instance, as the seat on the bridge and the shoulder presented by the head of the pivot, arranged respectively on opposite sides of the guard and of its intended plane of movement, is advantageous whether or not the spring is located below the bridge, or, in other words, whether or not the latter is arranged between the spring and the guard, as shown in the present embodiment, because the guard is thus confined definitely to its plane of movement and is prevented from wabbling or rocking transversely thereof, while at the same time its pivot can be used for supporting the spring centrally and symmetrically with respect to the movement of the guard and at an outside or accessible point. But, when the spring is so located, I am enabled to utilize both sides of the support or bridge and provide a convenient stationary bearing surface adjacent the spring as well as the guard, and in some forms either the spring

or guard can be removed independently of the other. With the parts thus arranged it is, of course, necessary to provide a connection or part extending transversely through the horizontal plane of the support or bridge, and this in the present form is formed by the loop or bend at the forward end of the guard levers. This construction enables me to bring the guide for the opposite side of the guard, formed by the head of the screw, in the present instance, close to the bridge. providing a short bearing and also to bring an extension or projection from one of the above-mentioned confining abutments of the guard in line with the pivotal axis of the latter to a location at which it centers the spring coiled around it at a point where plenty of room is afforded for its accommodation and manipulation."

The patent has 52 claims, of which 15 are said to be infringed— 1, 2, 12, 13, 15, 28, 31, 34, 35, 36, 39, 40, 41, 42, and 43. Eight of these are conveniently referred to by the patentee as the first group—1, 2, 12, 13, 15, 34, 35, and 36. Of these, he says, claim No. 1 is typical of the group. He classes six other claims of his patent as constituting the second group—Nos. 28, 31, 40, 41, 42, and 43. He regards No. 43 as typical of this group. Claim 39 is placed by itself, and is said to be the expression of the broad invention. In all the structures brought before us, three principal elements are involved:

1. A support which is connected with, or forms at least a part of, the bridge connecting the two lenses together.·

2. A guard-lever, carrying the guard, and pivotally mounted with the support.

3. A spring, controlling the position of the guard-lever **to** hold the guards against the nose and the glasses in position.

Claim 39 states briefly this combination:

"An eyeglass mounting comprising in, combination a pivoted guard, a positioning spring therefor, and a supporting portion on the mounting arranged between said parts."

1 (a). We are brought at once to the consideration of the prior art, having reference to the broad expression of the invention found in claim 39. We have already quoted the parts of the specification which relate to the purpose and scope of the patent. We are unable to find therein any disclosure of special utilities in this combination. Of claim 39 complainant says:

"This claim is directed to a finger-piece pivoted guard located on one side of the supporting seat formed by the bridge and either above or below it, and a spring located on the other side of the support from the guard. This feature is the broad expression of the inventive idea in a finger-piece mounting of the location of the spring either above or below the guard, but beyond the surface, on which it is supported so that, in the case of a removable spring or an independent spring, the bearings of the guard are not to be disturbed by anything which may happen to the spring."

Taking the claim, thus defined, as the broad expression of the patent, let us look at some of the structures brought before us in the prior art. The Cottet patent, United States 560,895 (1896), English, issued to Raphael, No. 8,366 (1894), appears to lie at the foundation of the art. One of the witnesses offered by the complainant speaks of the "Cottet style" as "the prevailing first wire-spring, finger-grip eyeglass." In this patent the idea was clearly in the mind of the patentee to control guard levers, pivoted on the frame by means of

springs, and to leave the detailed arrangement of the parts to the judgment of the mechanic. In claim 1 of the British patent we find the combination stated:

"In pince-nez the fixing of plaquettes upon rock levers pivoted upon the frame of the pince-nez and controlled by springs for the purpose set forth."

In the specification it is said:

"The spiral springs also can be replaced by any other kind of sping, and can be fixed differently."

In the Cottet patent the spring and the lever are on the same side of the support; but it is not satisfactorily shown to us that any new utility is obtained from the combination set forth in the patent in suit by placing the spring and lever on opposite sides of the support.

In the Wells patent, No. 813,030 (1906), we find a substantial statement of the combination stated in claim 39 of the patent in suit. The patentee, Wells, insisted that his disclosure to the art was the mounting of the spring so that its axis would be in line with the axis of the pivot and lever, but at the same time so mounted as to be readily detachable without interfering with the other parts. A commercial embodiment of this patent was found in what is called in the record "the Wells-Vici" mounting, and also in what is called "the Pease-Chapel" mounting. The record contains some conflicting evidence relating to these commercial embodiments of the patent. Inasmuch as it appears to us that the patent itself, in its language, anticipates the substantial combination of claim 39, we do not think it necessary to consider the actual embodiments of the patent in commercial use.

In the Terstegen patent, United States No. 250,070 (1882), German No. 16,847 (1882), we find a combination with the lever on one side of the support and the spring on the other, with its end passing through the plane of the support to control the lever, and with spaced bearings for the lever. Substantially the same is found in the Pritchard patent, United States No. 11,404 (1903). The arrangement of the spring and lever on opposite sides of the support appears to be within the scope of the statement in the Kime patent, No. 762,911 (1904). In this patent the general arrangements of the support, lever and spring are shown by way of illustration. It seems clear that at that stage of the art the patentee laid no stress, and claimed no patentability, on any specific arrangement of the three parts. The Wood patent, No. 8,124 (1894), and the Archer patent, No. 1,568 (1889), are also cited as containing an illustration of the substantial combination found in the patent before us. Our attention is also called to the Lewis patent, No. 791,629 (1905); the Peck patent, No. 841,568 (1907); the Finch patents, No. 666,928 (1901), and No. 666,929 (1901); the Ganoe patent, No. 664,941 (1901); the Becker patent, No. 873,342 (1907); the King patent, No. 927,981 (1909); and the two patents to this patentee, Adt, No. 862,368 (1907), and No. 872,211 (1907). The defendant urges that in these patents, cited in the prior art, we find all the features found in the claim we are discussing, and, in fact, all the elements involved in all the patents which form the subject of this controversy. The features to which our attention is directed, said to be the elements of

the patent in suit, and found also in the patents brought to our attention in the prior art, are:

The opposite arrangement of spring and guard lever with reference to the support; the spaced bearings for the guard lever; the fixed pivot for the guard lever; the fact that one end of the actuating spring is associated with either the support or the lever; a spring in axial alignment with the guard lever; a centering post for the spring; a flat coil spring; a spring unsupported between its ends and detachable independently of the lever; a lever portion extending through the plane of the support, and coacting with the spring; a shoulder upon a centering projection abutting and supporting the spring, and projections on opposite sides of the support. The contention of the learned counsel for the defendant is that all these elements are found, not separately in various patents, "but to the extent that their assemblage might be desirable in any given structure, that they are disclosed in combination." Upon a careful examination of the prior art, we think this position of the defendant is sustained by the testimony.

The defendant refers specially to the two Adt patents cited. In each of these patents the position of the spring, and the fact that it is integral with the guard lever, is claimed. The learned counsel for the defendant urges that Adt knew the construction found in the fundamental patent to Cottet, and that he modified the arrangement of support, guard lever, and spring of the Cottet construction by the Tenax model, Cottet style, which embodies spring, support, and lever; that, since he could not pre-empt the Cottet arrangement, he attempted to pre-empt the other obvious positions of spring and guard lever with reference to the support; and that these positions involved placing the spring at the side of the support, and under the support. The learned counsel for the defendant further urges that Adt has obtained some 26 patents for finger-piece mountings, including the patents in suit, and that he has embodied in these 26 patents about 445 claims, but has contributed only one finger-piece mounting to the commercial art, namely, that of his patent No. 872,211. We find much in the record sustaining the contention that Adt's effort appears to have been to claim every kind of combination which could be thought of in finger-piece mountings, with a view of occupying the ground in a new art. On a careful examination of the prior patented art, we are satisfied with the conclusion, arrived at by the learned judge who gave judgment in the court below, that the combination set forth in the broad expression of the patent found in claim 39 does not appear to possess such utility, originality, or novelty as entitled the plaintiff to patent it as his invention. It seems clear to us that the old elements are not so combined as to produce a new and useful result.

1 (b). Looking beyond the broad expression of patentability found in the claim just considered, is there any patentable inventive thought found in the specific features set forth in the other claims in the reissued patent, either taken separately or together with the broad expression of the patented idea described in claim 39?

The first group of claims to which we have already referred consists of claims 1, 2, 12, 13, 15, 34, 35 and 36. The complainant regards No. 1 as typical of this group. Claim No. 1 is:

"In an eyeglass mounting, the combination with a support, of a guard pivoted on one side of the support and extending in front and rear thereof, the rear portion of said guard having a bearing-pad thereon, and the forward portion constituting an operating arm, and a flat spiral spring located on the side of the support opposite the guard substantially in line with the pivot, and having one end connected to the support and the other to the guard."

This claim, in common with some others of the group, calls for a flat spiral spring; other claims requiring only a coil spring. If we examine the specification, we find no disclosure of added utility set out and claimed for the flat spiral spring over the coil spring. So far as anything is disclosed to us in the record, we must find that the one spring must be regarded as a well-known mechanical equivalent of the other. In view of all that is brought before us, we must hold that it did not constitute invention to place spring and lever on opposite sides of the support. This construction is shown in the prior art, in the patents to which we have called attention—referring especially to the Kime patent and to the Wells patent. We do not think it necessary to consider in detail the other elements brought before us in this group of claims. It seems clear that, in view of the prior art, none of them present any basis of patentability.

The complainant has placed certain other claims of the reissued patent in a second group, namely, Nos. 28, 31, 40, 41, 42 and 43. He says No. 43 is the typical claim. That claim is:

"In an eyeglass mounting, the combination with a support, a guard pivoted thereto to operate in an horizontal plane and a centering projection extending axially of the guard and to one side of the guard and support, of a flat spiral spring for positioning the guard coiled about the projection below the support, and two members, each independent of the spring, having bearing surfaces respectively engaging opposite sides of the guard lever to hold it against tilting in a vertical plane."

This claim defines the spring as a flat spiral spring, and it does not call for a spring and lever on opposite sides of the support. In view of the foundation patent—the Cottet patent—we do not think this claim, nor the others of this group, disclose anything more than the use and combination of well-known elements which, in view of the prior art, cannot be held to present anything patentably new. We have tried to disentangle the structures themselves from the mass of language which has been placed around them in the specification and claims. When so disentangled, we think the defendant properly analyzes the structures of this reissued patent as consisting of: A guard, carrying a lever pivotally mounted on top of support; a flat coil spring below the support, formed as an integral extension of the lever, the outer end of spring being tied to support. We are of the opinion that what we have said of claim 39 applies to all the structures set forth as illustrating the reissued patent. In view of the prior art, we think they do not disclose anything new and useful, and that they are not entitled to patentability.

2. We now consider United States patent No. 1,019,214. It is urged by the complainant that claims 1, 7, 8, 9, 11, 13, and 14 are infringed. Upon an examination of the structure presented in this patent, we find nothing different from that of the reissued patent, except that the spring and lever are cut in two; the inner end of the spring resting

in a socket on the end of the lever. The same control of the one over the other is presented, and the same result is obtained. We think the defendant is correct in saying that the only substantial difference is that, instead of an integral connection between the two members, as found in the reissued patent, we find in this patent that the spring and guard lever are cut in two, and a frictional engagement supplied between the two members. Substantially the same result, we think, is accomplished by the reissued patent as that sought to be accomplished by the patent before us. This patent describes the substantial construction of the reissued patent in 16 carefully worded claims, describing as many combinations. The 7 combinations which the defendant is said to infringe do not seem to us to set forth any substantially different elements from those found in the reissued patent. The complainant does not point out any utility in the structure of this patent distinguishing it from the original patent. Cutting an element in two does not constitute invention. Birmingham v. Gates, 78 Fed. 350, 24 C. C. A. 132; Chicago Grain Door Co. v. National Malleable Co., 173 Fed. 918, 97 C. C. A. 324. It seems to us that in this patent, the patentee has sought by an ingenious use of language in a refined art to enlarge the boundaries of invention, in order to extend it beyond the scope of earlier patents. In view of the disclosures in the reissued patent and in the prior art, we are constrained to hold that none of the 7 claims at issue describes a new and patentable combination.

3. We now consider patent No. 1,019,116. Claims alleged to be infringed are 1, 3, 10, 11, 14, 15, 17, 19, and 21. Claim 1 may be regarded as the typical claim. It is:

"In an eyeglass mounting, the combination with a support, a nose guard, and co-operating bearing members pivotally connecting the guard and the support of a spring for positioning the guard mounted independently of the bearing members and held in detachable engagement with the guard and with the support by action of the spring in the direction necessary to turn the guard on its pivot."

In this patent the outer end of the spring is operatively associated with the guard arm to control it by being bent around it; the inner end of the spring passes into a socket projected down from the support. The inner end of the spring passes into what is called a stirrup, like the stirrup of patent No. 1,019,214, but projected in this patent from the lower side of the support, instead of being projected from the end of the guard lever. It is contended by the defendant that everything material in this structure is anticipated in the patent to Becker, assigned to the complainant and his associates; that it is anticipated also in the Pritchard and Wells patents. It will be seen that, in the structure of the reissued patent which we first considered, the spring was connected at one end to the guard and at the other end to the support. In this patent now before us we have a spring connected with the parts with which it co-operates at both ends. Nothing in the patent itself, and nothing in the record, discloses any special utility in this combination over the reissued patent, or over other patents brought to our attention in the prior art. We fail to find any new and useful result in the combinations covered by the claims in issue

in this patent. In view of the prior art, we cannot regard the 9 claims presented in this patent as valid.

4. Patent No. 1,019,117 is before us. It has 12 claims. Claim 11 is the only claim in issue. It is as follows:

"In an eyeglass mounting, the combination, with a support having two projections extending from opposite sides thereof, of a guard lever mounted on one of said projections, a spring for positioning the guard mounted on the other and a shoulder on said last-mentioned projection for normally preventing the disengagement of the spring therefrom."

The structure is substantially the same as in the patent we have last considered, except that, in case of the so-called stirrup of the last patent, one side of the stirrup has been removed, forming an L-shaped stud projecting down from the lower side of the support around which the inner end of an elliptical spring is wound. The patent discloses no substantial elements of utility to be derived from this combination. In view of the prior art, we do not think any patentability is shown in this claim. We find no element in it that is not found in the Becker patent, No. 873,342. The elements seem also to be combined in substantially the same way. We think there can be no invention in combining the old and well-known methods of mounting the spring and giving it different positions to control the lever. We are unable to find in this patent a combination of old elements producing a new and useful result, due to the joint and co-operative action of all the old elements.

5. We now direct our attention to patent No. 1,040,096 (1912). Three claims, out of a total of 29 claims, are in issue. Claim 26 is regarded as typical. It is:

"The combination, with a support for the lenses and a finger-piece guard lever mounted thereon to swing substantially in a horizontal plane, of a spring for positioning the guard coiled about the axis thereof, and having one end extended outwardly from the coil, and a free arm on the lever extending in a vertical direction and detachably engaging the spring arm."

The structure is substantially the same as the one we have just considered, except that the pivot pin is fixed to the lever, and turns with it; the outer end of the spring is bent in the form of an arm to rest in a socket in the guard lever; the inner end of the spring is brought outward to rest against the support. We think the contention of the defendant must be sustained that in view of the prior art there is no invention in bending an arm of the lever in a vertical plane, up or down, to meet the spring, or in extending an arm or pin from the lever in a vertical plane to meet the spring. As defendant suggests, the spring is made of material which can ordinarily be more easily bent, and therefore in a great number of instances the spring is bent to meet the lever. We have before referred to the British patent to Cottet, where it is made clear that spiral springs may be replaced by any other kind of springs, and can be "fixed differently." In view of the prior art, and in view of what we have said in reference to other patents, we are constrained to find that in this patent no combination of the old elements is found which presents anything patentably new.

The court below decided that in no event could the claims in this patent be given a construction broad enough to cover the defendant's

different method of making its spring at the outer end detachably engaging the arm or projection from its guard. In view of what we have said, it is not necessary, however, to discuss the question whether or not the defendant has infringed.

[2] 6. This bill was filed in February, 1913, about 11 months after the patents were issued. It cannot, then, be urged that there has been any acquiescence in any of the claims at issue.

The record fails to show any commercial success of the patents in suit. In Railroad Supply Co. v. Hart Steel Co., 222 Fed. 261, 274, —— C. C. A. ——, in sustaining the validity of a patent, the Court of Appeals for the Seventh Circuit held that courts should give special heed to the place achieved by the patented article in the field of the practical art since the date of the patent, and should decline to sustain a defense of noninvention, and strike down the patent and the business built upon it, unless the defense has been established beyond a reasonable doubt. The case now before us presents a marked instance where, so far as the record shows, the patented article has achieved no success in the field of the practical art. In our opinion, this fact is entitled to much weight.

The records of the Patent Office and file wrappers of the several patents have been brought to our attention. We do not, however, find it necessary to discuss the various questions which have arisen in the Patent Office relating to the several patents before us. In reference to matters in the Patent Office, the learned judge who gave judgment in the court below stated certain important facts shown by the record:

"The application for the original or reissue patent No. 13,466 was filed February 17, 1906. But this original patent was not issued until after more than six years had passed, viz., on March 5, 1912.

"The application for the divisional patent No. 1,019,214 was filed after the above proceedings had been pending more than three years (November 6, 1909). This patent also issued March 5, 1912.

"The applications for patents No. 1,019,116 and No. 1,019,117 were filed after the same proceedings had been pending, on the first application a year and a half (September 8, 1907), and on the second over three years (November 3, 1909). Both these patents also issued on March 5, 1912.

"The length of time covered by these proceedings appears to have been due to reluctance on the part of the Patent Office to accept the patentee's claims as warranted by any invention shown in his disclosures; a reluctance overcome by him only with difficulty. While the above-named applications were pending, he had various others also pending, also for patents on finger-piece mountings.

"His claims here in issue, as they now stand, are not found in his applications as originally filed. It was by amendment, or by addition as new claims, from time to time before final allowance, that they took their present form. There are numerous instances of the transfer of claims from one pending application to another. There was a progressive increase in the total number of claims.

"Thus, the application for the original of reissue patent No. 13,466, when filed February 17, 1906, contained 11 claims only. An amendment of March 9, 1910, increased the number to 29. Eight of these were finally rejected May 20, 1911, including 3 now in issue. But, from no reason apparent from the record, all were, nevertheless, allowed January 13, 1912, together with 15 others first presented October 18, 1911, and 4 others first presented January 11, 1912, bringing the total to 48. The last two additions include 9 more of the claims here in issue, among them the broad claim No. 39. Similar facts appear in the histories of the other applications.

"During the long period covered by the above proceedings, manufacturers of finger-piece mountings in various parts of the country, who appear to be by no means few in number, devised from time to time, as might naturally be expected, various improvements in such mountings. Patents were applied for and obtained for some improvements so devised. Among these were the improvements covered by the patent under which the defendant manufactured its device, issued in June, 1911, before the issue of any patent here sued on. Other improvements, devised as above, appeared upon the market without being patented.

"The patentee is shown to be an expert in this art, and to have devoted his attention for several years to finger-piece mountings. Since 1900 he has taken out numerous patents for various improvements in them. His familiarity with all that was being done regarding them while his numerous amended or additional claims were being from time to time added to or distributed among his pending applications, as above, may be presumed. I do not find in the disclosures made in any of his patents in suit satisfactorily clear and distinct statements of what is new with him in the structures described, or how they secure results not previously obtained. Nor do I think it unreasonable, in view of all the above, to regard all the claims in suit as manifesting an effort on the patentee's part to make what he describes cover, by the use of carefully studied general terms, much more than anything described could properly justify."

Much art has been displayed by the claim writer, in the patents at issue, in describing every kind of a combination of which the elements are capable, without disclosing any new and useful result, and without making any clear statement of what is new with the patentee in the structures produced. Great skill has been used in stating slight distinctions. In several of the claims, language appears to have been employed to clothe and adorn attempted differentiations where no real differences appear. In such claims, the impression is suggested that the claim writer is seeking to make language take the place of invention. In a recent case, Æolian Co. v. Wanamaker, 221 Fed. 666, 667, 669, Judge Thomas comments upon the claims before him:

"The claims are ingeniously drawn, and are a multiplication of the permutations of all the possible combinations of the parts or elements forming the alleged combinations."

In holding the patent void for lack of invention, Judge Thomas cited and grouped many cases where a mere change in location of elements was presented, without change of function or mode of operation, and where it was held that there was no invention.

It is undoubtedly true that, under the policy of the patent law, in order to fix the boundaries of a patented invention by distinct and formal claims, it is necessary to make a clear analysis of the subject, and often to use much refinement of speech in pointing out the various utilities effected by the elements described. But where such refinement of language is directed to describing trivial differences existing between possible combinations of the various elements involved, it does not aid the court in an interpretation of the patent, and is of no service to the public, after the patent has expired, in giving information relating to the scope of the invention which has become a public benefit.

The decree of the District Court is affirmed; and the appellee recovers its costs of appeal.