## ALUMINUM CO. OF AMERICA v. STERLING PRODUCTS CORPORATION.

No. 9538.

Circuit Court of Appeals, Eighth Circuit.

July 18, 1933.

Rehearing Denied Sept. 13, 1933.

F. O. Richey, of Cleveland, Ohio (B. D. Watts, of Cleveland, Ohio, Fordyce, White, Mayne & Williams, of St. Louis, Mo., and Richey & Watts, of Cleveland, Ohio, on the brief), for appellant.

John H. Bruninga, of St. Louis, Mo. (Paul Bakewell and John H. Sutherland, both of St. Louis, Mo., on the brief), for appellee.

Before STONE, VAN VALKEN-BURGH, and BOOTH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

This suit involves five patents numbered and described as follows:

Letters patent No. 1,296,588 to J. H. Bamberg, inventor. for "Metal Mold"; letters patent No. 1,296,589 to J. H. Bamberg, for "Casting and process of making same"; letters patent No. 1,296,590 to J. H. Bamberg, for "Metal Mold"; letters patent No. 1,296,591 to J. H. Bamberg, for "Piston Casting"; letters patent No. 1,296,595 to A. B. Norton, for "Process of making Castings." Of these patents Nos. 1,296,588 and 1,296,590 are machine patents; No. 1,296,591 is a product patent; No. 1,296,595 is a process patent; and No. 1,296,589 is for both process and product. These letters aggregate 129 claims, of which 28 are here involved; in No. 1,296,588, claims 1, 4, 40, 41, 50, 51, 53, 57, 62, and 68; in No. 1,296,589, claims 2, 3, 9, 14, 16, 19, 21, 23, and 24; in No. 1,296,590, claims 9, 10, and 14; in No. 1,296,591, all of the four claims; in No. 1,296,595, claims 14 and 15. All of these patents were issued on the same date, to wit, March 4, 1919. Appellant herein, plaintiff below, alleges infringement, and prays injunction, accounting and damages. Appellee, defendant below, charged with using and selling apparatus, methods, articles, and materials, alleged to embody the improvements said to be described in the aforesaid letters patent, operates, with certain modifications as to number of cores and method of operation, not here deemed controlling, under the provisions of its own Flammang & Bowser patent, No. 1,551,193, issued August 25, 1925. The title of the last-named patent is "Method and Apparatus for Casting Trunk Pistons." The invention "relates to piston molds used for die casting pistons of aluminum and similar metals and alloys." The specification emphasizes the importance of facilitating handling of the various parts of the mold, reducing manual operation, and the time consumed in making a casting to a minimum. The main defenses urged are a denial of infringement and of the validity of the patents in suit.

The trial judge is recognized as one with especial qualifications and learning where the complex technical questions and scientific principles here present are involved, and his findings upon the subject-matter of the litigation are entitled to great respect.

The patents in suit all deal with the fairly simple and well-known subject of a metal hand mold for the making of aluminum alloy pistons for internal combustion engines. As the trial judge says,[1] "the confusing and un necessary verbosity and prolixity of the patents, the wide range of defenses, the size of the record, and the length of the briefs have rendered the case unnecessarily difficult and confusing." He therefore proceeds to clarify the situation by express findings, substantially as follows:

(a) Alloys of aluminum-copper-magnesium and iron are old in the art of metallurgy.

(b) The split skirt of the piston (emphasized by appellant) is not claimed.

(c) Prior to this invention in 1913, there existed an aluminum-copper-magnesium piston molded in a permanent mold.

(e) Each patent has a three-piece core except No. 1,296,588, which has a five-piece core. The accused device has a three-piece core; formerly a five-piece core—now abandoned.

(f) The nature of the alleged improvements is usually stated generally as relating to metal molds—not limited to aluminum alloy pistons.

(g) The modus operandi is then described as follows:

"The outer shell of these molds consist of two parts or halves, slidably mounted on a base, so that manually these two halves of the mold shells may be brought into close contact and latched during operation. These outer shells in their interiors conform, of course, to the outside configuration of an ordinary piston for gasoline engines, save that the piston-ring troughs do not appear, but are afterwards, on turning up the piston, to be chamfered in.

"The cores of the patents in suit (except in Patent 1,296,588) are three-piece cores. Two of these core parts on their external sides conform to the interior of an ordinary piston for an ordinary internal combustion engine, and have openings to engage insertible pins, which go through the outer shells to form seats for the wrist-pin of the gasoline engine for the purpose of making the crankshaft connections. These two core parts are also machined to form bosses or inner trunnions to strengthen the wrist-pin seats. Between the two core parts above described there is a third core part which fits between the two first-mentioned and closely engages therewith. Attached to one of the outer shells of the mold there is a gate of unusual and peculiar construction. This gate is illus-

---

[1] Orally.

trated as having a mouth (into which, of course, the molten metal is poured), which is large and flaring. Below this flare there is a goose-neck, forming a trap. When this trap is filled the molten metal must flow over a riser and enter the mold through an opening thereinto which is practically the whole perpendicular height of the inner mold, or, in other words, practically of the height of the piston to be molded.

"This gate is the peculiar improvement of Norton, according to the patents in suit, though it was shown in all of the five patents in suit, including, of course, the four Bamberg patents.

"In the patent which claims the five-piece core the only difference is brought about, practically, by splitting each of the two side-pieces of the three-piece core along the center lines thereof, so that the four core parts thus may be disengaged from the inner trunnions or wrist-pin bosses by a turning or wiggling movement instead of a straight-forward movement toward the center of the core after the central piece of the core has been withdrawn.

"In operation the three (or five-part core) is assembled; the two shell parts of the mold are brought in contact by handles provided for that purpose and according to old practice. The shell parts are then latched and the molten metal is rather swiftly poured into the mold, keeping the flaring mouth of the mold filled as it sinks in the shrinkage of crystallization. After waiting until the visible metal in the gate has slightly frozen, the central part of the core is withdrawn manually, the side-pieces are removed manually and the shell parts of the mold are slid apart, leaving the piston on the base."

(h) The patents in suit mold the piston head down; the skirt being poured last. Appellee molds the skirt down and first and the piston head up, and, so, last.

(i) The accused device may be called a molding machine. It is operated hydraulically—the patented device is operated manually. The former is based upon Flammang & Bowser patent, No. 1,551,193, issued August 25, 1925, except that the latter has a five-piece core.

(j) The chief constituents of the mechanical patents are: (1) Two mold shells; (2) means of contacting and withdrawing contact to form a mold; (3) the core and its formation; and (4) "the gate which plaintiff's predecessor and it, experimenters found and decided to be the most important constituent, which, being right and rightly posi-tioned, meant success, but which, being wrong, spelled defeat."

(k) The gate of the accused device, differing from that of the patents, described above, is the ancient bullet-mold gate, having a large mouth for excess metal to account for the shrinkage of crystallization, through which gate the metal descends by gravity, with no gooseneck forming a trap.

(l) All of the constituent elements in the patents in suit are old in the prior art. (Doherty No. 170,070 and Kiel No. 643,656.)

(m) Methods of slidably mounting the two shells of the mold are old, as well as methods of contacting the two shell parts, as taught by the patents in suit.

(n) Three, five, and multiple part cores are common in the molder's art, so much so that their arrangement to make the outside of the assembled cores conform to the inside of the metal object to be molded is a mere mechanical task.

(o) The gate of the plaintiff's patents in suit is old in substantial form and effect. However, appellee does not use it. Plaintiff's mechanical patents in suit are combination patents improved by an original gate which defendant does not use.

(p) The rule adopted with respect to infringement of combination patents is that of Electric R. Signal Co. v. Hall R. Signal Company, 114 U. S. 87, 5 S. Ct. 1069, 29 L. Ed. 96, as follows: "To constitute identity of invention, and therefore infringement, not only must the result obtained be the same, but in case the means used for its attainment is a combination of known elements, the elements combined in both cases must be the same, and combined in the same way, so that each element shall perform the same function: provided, however, that the differences alleged are not merely colorable according to the rule forbidding the use of known equivalents."

(q) The court then applies this rule to the case at bar thus:

"How stands the case in the light of these rules? Defendant uses an old gate (the ancient bullet-mold gate), while the patents in suit use either the gate of Doherty's patent, supra, or an entirely new gate which Norton, and not Bamberg, invented. Each takes the remainder of the constituent elements of their several inventions from the old art, and each makes an identical product. Going further, do they make it in the same way? Plaintiff's patents in suit teach that the skirt should be poured last; defendant pours it first, not-

withstanding the whole of the specifications of the patents in suit and the evidence of plaintiff's protagonists and compurgators, when fairly read, disclose that it was not possible to so pour a piston, that is, to pour the molten metal for a piston in the way which defendant pours it. The gate of defendant's accused device is diametrically and radically different from the gate disclosed by plaintiff's patents in suit, again notwithstanding the fact that the evidence of plaintiff tends to show that it is not possible to use successfully a gate such as defendant uses. True it is, that the broad claims for the gate of plaintiff read almost verbatim on the gate of defendant, though actually, as is obvious at a glance, the two gates are almost as different as daylight is from dark. This illustrates an unnecessary difficulty put upon the courts by the present practice in the patent law. One solicitor may, for example, describe the old Barlow knife in language which so differs from that of another as that both get patents for the identical thing, or similarly, as here, one solicitor by the use of language made to conceal thought, may, and often does, as here, describe wholly different things in such wise as to include them within the category of the claim. In such cases, wherein this palpably appears, courts may go to specifications and the diagrams and eke out the falsity of the claim.

"Plaintiff's patents in suit, as already said, pour the piston head down, while defendant pours it head up. There are other differences between the teaching of the patents in suit and the accused device, and the Flammang & Bowser patent. Many of these, in addition to those I have noted, are found in the brief of defendant. But if the law still is, as it ought to be, as laid down in the case of Electric R. Signal Company v. Hall R. Signal Company, supra, no reason exists to pursue this matter further. I am, therefore, of the opinion that neither the five-piece core device of defendant (now abandoned in use) nor the three-piece core device, nor the Flammang & Bowser patent, infringes either of the mechanical patents in suit."

The court next takes up patent No. 1,-296,589, relating to castings and processes of making the same, containing three process claims and six product claims. Of the former process claim No. 9 is typical: "The process of making skirted piston castings for internal combustion motors which consists in causing molten metallic alloy in which a eutectic will exist after final freezing and which alloy has a relatively low specific gravity and a relatively high crystallization shrinkage and coefficient of heat conductivity, to flow under the action of gravity into a mold cavity, the walls of which are constituted of metal maintained at a chilling temperature as compared with the temperature of the molten alloy, causing progressive setting of the casting in the presence of a surplus of molten alloy which is drawn upon to compensate for and fill up cavities due to crystallization shrinkage, causing solidification of the casting to be effected with the eutectic substantially surrounding the excess substance, and then freeing the casting from the walls constituting the mold cavity."

Concerning this claim the trial court among other things says:

"Not only is the above claim, but all of the three process claims, and the specifications, shot through for column after column, with such meaningless and indefinite statements (when applied to a matter of process requiring certainty and definiteness) as 'consisting in causing molten, metallic alloy in which a eutectic will exist after final freezing,' and 'the walls of which are constituted of metal maintained at a chilling temperature as compared to the temperature of the molten alloy' but the above language is in many other respects wholly obscure and indefinite.

"A eutectic would exist, as every one knows, because it was there in the beginning in the old alloy used, and it could not be gotten rid of or kept from functioning. * * *

"It is obvious that no metal can be molded unless it is poured into a mold which chills it, thus causing freezing. There are nowhere in the claims or specifications any certain or definite temperatures given, showing the extent of chilliness. * * *

"To me it seems so apodeictic as to render exposition unnecessary, that plaintiff may not by the process described, or omitted so to be, obtain a monopoly over the fairly simple and certainly ancient method of molding metal, and that it may do it largely by the use of recondite terms, which as used are meaningless."

The six product claims come next, which, as the trial court says, declare a monopoly in the manufacture of aluminum-copper-alloy pistons, however made or molded.

Claim 14 of patent No. 1,296,589 is taken as typical: "As a new article of manufacture, an internal combustion motor piston casting made of a metallic alloy in which a relatively small volume of eutectic exists after freezing and substantially surrounds the excess substance and which alloy has a rela-

tively low specific gravity and a relatively high crystallization shrinkage and coefficient of heat conductivity, the structure of the casting being substantially free from cavities due to the crystallization shrinkage and relatively fine-grained."

Concerning these claims, Judge Faris says:

"The short and simple answer to the validity of the six product, or article of manufacture claims, is that aluminum-copper-alloy pistons were already in existence, and the genus piston itself had existed for scores of years. The record shows that such pistons were made in Indianapolis, or, at least, used there, and it fairly shows that they were made in Birmingham, England, and molded in sand molds at many places before Bamberg came into the field. The Birmingham piston, which was a copper-alloy-aluminum piston, bore physical evidence, obvious to any one, that it had been molded in a metallic mold having a multiple piece core.

"It is difficult to invent a thing already invented. Such things may be improved, or the making bettered, but this is far from inventing an article of manufacture and getting a monopoly over it, however made, as against the world."

Finally, it is held that what has been said respecting patent No. 1,296,589 applies equally to patent No. 1,296,591. The claims in suit of both patents were held invalid for want of invention, for indefiniteness, and for unwarranted broadness.

We have quoted thus freely from the opinion of Judge Faris, because the clear, crisp language with which he points out the weaknesses of the patents in suit admits of no improvement in clarity nor force.

With respect to all these patents an interesting question is presented which has not, perhaps, been expressly decided, but which is worthy of consideration in the situation here present.

Section 4888, R. S. (35 USCA § 33) of the patent law provides that the inventor shall describe his invention in "full, clear, concise, and exact terms," sufficient to enable a person skilled in the art to make, construct, compound, and use it. Section 4920, R. S. (35 USCA § 69) prohibits any practice whereby "for the purpose of deceiving the public the description and specification filed by the patentee in the Patent Office was made to contain less than the whole truth relative to his invention or discovery, or more than is necessary to produce the desired effect."

Carlton v. Bokee, 17 Wall. 463, 21 L. Ed. 517.

We have here five patents of great prolixity, in which there is unnecessary and confusing reiteration and repetition, where excessive "refinement of language is directed to describing trivial differences existing between possible combinations of the various elements involved" (Adt v. Bay State Optical Company [C. C. A. 1] 226 F. 925, 934), calculated to erect a complex and imposing structure of chemical and mechanical elements, but, as the trial court says, with the fairly simple object of making a metal hand mold, general in nature, but more specifically intended for the construction of aluminum alloy pistons. These patents are expressly interdependent and interrelated. In the case of patent No. 1,296,589, after notice of allowance, solicitor for the patentee wrote the Commissioner of Patents thus: "I have to request that issue be delayed in this application for a period of ninety (90) days, or so much thereof as may be necessary to permit simultaneous issue with other related cases."

All were issued March 4, 1919. In substantially all of these patents the same mechanical and chemical processes were described with the same degree of particularity, and in substantially, if not literally, the same language. This led the Examiner in one instance to admonish the inventor to distinguish carefully between distinct inventions. In another case the Examiner said, "The statement of the nature and object of the invention, pages 1 to 14, is prolix and should be shortened"; but this direction does not seem to have been observed. The unification of the patents with respect to the underlying basic principle of the alleged invention is illustrated especially by the treatment of the gate. Respecting this point No. 1,296,588 says: "20 indicates the gate for the mold; it may be of any desired form. The gate is preferably formed by cutting away the adjoining faces of the opposing walls 5, so that when the members 3, 4, are assembled together the cutaway portions form a gate of the desired shape. The shape and construction of the gate 20 herein shown for illustrative purposes I believe to be the sole invention of A. B. Norton, of Detroit, Michigan. As such invention will form the subject-matter of a separate application, further description of the gate herein will not be necessary."

Emphasis is there placed upon this construction of the gate, a gooseneck type not used by appellee, as follows: "The construction of the gate is such that a liquid seal is

formed at 20a as the metal flows through the gate. This seal after it is formed tends to preclude the passage of air and gases into the mold cavity A and also to materially reduce splashing of the metal within the gate during the pouring. Splashing further is substantially eliminated by forming the wall 20b in such way that the metal flows smoothly along it and thence into the cavity A. Air and gases within the mold cavity escape in the well-known manner through the vents provided as hereinbefore described. The metal rises from the bottom of the mold cavity upwardly until it engages with the lower end of the inserts 23, when the casting B is completed, having in this example two inwardly extending tubular bosses, b, b, and two inwardly extending ribs $b^1$, $b^2$, disposed at right angles to each other. The weight of the metal in the upper portion of the gate serves to force the metal into the mold cavity to complete the casting, the upper end wall of the casting being substantially in line with the upper portion of the gate which directly feeds it. In addition to trapping out the air this construction of gate in actual operation serves to prevent oxids of the metals poured and other foreign materials from entering the mold cavity."

For a clearer understanding of the significance of this language we here append Fig. 4 of the drawings in patent No. 1,296,588, which shows the form and indicates the function of the gate used.

Precisely the same language above quoted, and substantially the same qualities attributed to this peculiar construction of gate, occur in patents No. 1,296,589 and No. 1,296,590; and in patent No. 1,296,591, for a full description and explanation of the mold and the process of producing the casting by means of it, reference is made to the pending application, serial No. 82,529 (patent No. 1,296,-589), referred to as the original application for this patent. So, taking these references carried forward to the Norton patent, No. 1,-296,595, all patents being issued on the same date by express request, it is obvious that this specific form of gate was essential to the successful operation of the process, embodying the basic principle of the invention, as fully as though the gate had been incorporated in the claims as an element.

In addition to what has been said respecting the form of gate shown and referred to in the drawings and specifications of appellant's patents, Dr. Jeffries, expert witness for appellant, very nearly admitted the necessity of a gate of this description. He was asked what was essential to produce a good aluminum piston casting. He included a gate among the elements he enumerated.

"Q. You included a gate: Does that gate have to be of a certain construction? A. Yes, it is essential that the gate perform a certain function, namely, permitting the rapid and smooth pouring of the metal into the mold cavity, and the feeding of the castings with

Fig. 4.

964

reference to crystallization shrinkage during solidification of the metal."

The principle here under discussion is very closely suggested in the following opinions of this court: Gruendler Mfg. Co. v. Harry L. Hussmann Refrigerator & Supply Co., 16 F.(2d) 571, 573, and Automatic Appliance Co. v. McNiece Motor Co., 20 F.(2d) 578, 582.

If, then, the gate be left out entirely, because not specifically named in the claims in suit, as appellant contends, is the mechanical combination patentable? All the elements are old. We have here a familiar combination of elements to make a metal mold.

■ "Where all the elements of a patented combination, or their equivalents, have been previously employed in some combination for the production of the same or a kindred product, and their functions remain unchanged, that the new combination accomplishes a better result does not evidence invention." Western Willite Co. v. Trinidad Asphalt Mfg. Co. (C. C. A. 8) 16 F.(2d) 446.

■ We do not see, so far as the mechanical patents are concerned, that we have here any substantial departure from the long and well known method of making metal molds. If, as it claims, appellant's system makes this aluminum piston a little better, this does not evidence invention. The court below found it unnecessary to declare anticipation and invalidity, although it approached that result, and, of course, such action, while not to be arbitrarily avoided, should not be taken except in clear cases. However, what has been said with respect to the close similarity between prior art methods of making metal molds and that of the patents in suit has a direct and important bearing upon the question of infringement. In this view, we are inclined to adopt the finding of the trial court on this phase of the controversy. We think the method employed by defendant is substantially different in form and principle from that of plaintiff. It is, in fact, an improvement in point of practical efficiency upon the invention of plaintiff—itself an improvement, if anything, over the prior art. McCormick v. Talcott et al., 20 How. 402, 15 L. Ed. 930. This holding is supported by the subsequent Flammang & Bowser patent, No. 1,551,193, issued August 25, 1925; which reads upon defendant's device:

■ "It is a general rule that there is a legal presumption that a process or apparatus of a later patent does not infringe upon that of an earlier patent relating to the same subject." Century Electric Co. v. Westinghouse Electric & Mfg. Co. (C. C. A. 8) 191 F. 350, 351.

■ Coming now to the product and process claims, we think the former are clearly invalid upon the grounds stated by the trial judge. Concerning the process claims, it would seem that the decision centers about required definiteness of the teachings respecting the composition of the alloys and of the temperatures prescribed by the claims. Judge Faris finds these indefinite, insufficient, and, in some respects inconsistent. The Examiner was befogged by specifications respecting the eutectic, and the inventor's solicitor responded with a deluge of involved technical terms which fail to clarify. The Standard Dictionary defines the adjective "eutectic" as "melting readily or at a low temperature; said of a compound substance that has a lower fusing-point than its components have by themselves." The noun is defined as "A Eutectic substance, as an alloy."

It is said in the specifications that it is the composition of the alloy which determines whether any eutectic will be present; that the method of casting determines the structural relation of the eutectic to the excess portion; that progressive setting in the casting is the important factor in reducing porosity, due to crystallization shrinkage. This is produced by making the mold cavity and the gate so correlated that at no time is liquid metal allowed to be isolated in any part of the casting during the greater part of the solidification period. As Judge Faris and appellant's witnesses say, eutectic is always present and cannot be entirely excluded. But Bamberg assumes to control this component of a molten mass so precisely that he makes it, at will, surround, or, rather, at times partially or substantially surround, the excess material of the compound, and to contact with different portions of the core and mold walls as desired. Conceding, but not deciding, that this may be done, it is not perceived that, in the claims or in the specifications, it is taught how this may be done, beyond the exercise of pure experimentation. Judge Faris in ruling against infringement of the machine patents included No. 1,296,595 as in the same category. Whatever may be thought of this ruling, it is clear that this Norton patent is open to the same charge of indefiniteness and broadness as in patents No. 1,296,589 and No. 1,296,591. It seems to us that what the patentees have done is so to complicate and confuse the elements of their alleged inventions, by the prolixity of specification and claim, as to lay the foundation for a monopoly in aluminum pistons for internal combustion en-

gines, by whomsoever and by whatsoever process and mechanism produced.

We think, therefore, that the decree below should in all things be affirmed.

On Motion for Rehearing.

PER CURIAM.

In the motion for rehearing emphasis is placed upon the contention that our decision is in conflict with that of this court in Donner v. Sheer Pharmacal Corporation, 64 F. (2d) 217. We have given full consideration to the latter case and find no conflict in the views expressed. In the Donner Case the rule announced is that, "if description in patent is such that one skilled in art can follow it and produce result which patent claims, it is sufficiently certain." It was held that the description in that case was sufficient under that rule. In the case at bar both the trial court and this court found that the description in the process and product patents was insufficient in that respect; the patents being invalid "for want of invention, for indefiniteness and for unwarranted broadness." Speaking of patents No. 1,296,595, No. 1,296,589, and No. 1,296,591, we repeat that, from the record, it is our judgment that "what the patentees have done is so to complicate and confuse the elements of their alleged inventions, by the prolixity of specification and claim, as to lay the foundation for a monopoly in aluminum pistons for internal combustion engines, by whomsoever, and by whatsoever process and mechanism produced."

See Carlton v. Bokee, 17 Wall. 463, 21 L. Ed. 517; Adt v. Bay State Optical Company (C. C. A. 1) 226 F. 925; and compare Anchor Cap & Closure Corporation v. Linhardt et al. (C. C. A. 8) 56 F. (2d) 542, citing Permutit Company v. Graver Corporation, 284 U. S. 52, 52 S. Ct. 53, 76 L. Ed. 163. We are satisfied with the conclusion reached in this case, and the motion for rehearing is denied.